[No. 27301-9-I.   Division One.   September 23, 1991.]

KATHRYN DESMOND, *Respondent*, v. LIBERTY NORTHWEST INSURANCE CORPORATION, *Appellant*.

*William R. Hickman, Marilee C. Erickson,* and *Reed McClure,* for appellant.

*John M. Graham,* for respondent.

PEKELIS, J. — Liberty Northwest Insurance Corporation appeals an order requiring it to pay a pro rata share of its

insured Kathryn Desmond's attorney fees incurred in a lawsuit Desmond brought against a third party tortfeasor. Liberty contends that the trial court lacked jurisdiction, thus its order is unenforceable. Alternatively, Liberty contends that the trial court erred in determining that Liberty had an obligation to pay a share of Desmond's attorney fees.

## I

On April 30, 1988, Kathryn Desmond was injured when her car was rear-ended by Nicole Larson's car. Allstate Insurance Company insured Larson, and Liberty Northwest Insurance Corporation insured Desmond. Desmond's insurance policy included up to $10,000 for medical expenses and $10,000 for lost wages.

On June 28, 1988, Desmond retained John M. Graham to represent her in her personal injury claims. On July 15, 1988, Graham wrote Liberty requesting "personal injury protection" (PIP) payments for Desmond. Because Graham was proceeding on Desmond's behalf against Larson, Graham also offered to represent Liberty on a contingency basis for any subrogation claim it might have against Allstate. Liberty responded on July 27, 1988, confirming Desmond's PIP coverage and stating that it would represent itself in its subrogation claim against Allstate.

Liberty began paying Desmond PIP benefits in July 1988. After several months, Liberty apparently stopped making these payments, and Desmond took the matter to arbitration to compel Liberty to continue making PIP payments. Desmond prevailed in the arbitration, and Liberty resumed the payments.

On September 9, 1988, Liberty sent Allstate a memo promising to "forward substantiation for rental and PIP upon receipt." On August 1, 1989, Liberty wrote Allstate, updating the status of its PIP lien, which at that time was $18,646.18 in medical expenses and lost wages. On February 5, 1990, Liberty notified Allstate of its final PIP lien, which totaled $19,984.43.

Meanwhile, in February 1989, Desmond had commenced an action against Larson to recover for injuries sustained in the accident. On March 20, 1990, Desmond also filed a complaint against Liberty to compel arbitration under the underinsured/uninsured motorist (UIM) provision of her insurance policy. Desmond argued that she was entitled to UIM compensation because Larson was an underinsured motorist.

Ultimately, Desmond settled with Larson for $60,000 in July 1990. Allstate issued a $40,015.57 check payable to Desmond and Graham. Allstate also issued a $19,984.43 check payable to Desmond, Graham and Liberty. The second check represented Liberty's PIP payments to Desmond.

On October 9, 1990, Desmond filed a motion in the UIM action to determine reasonable attorney fees and to disburse funds. Desmond asked the trial court to allow her to place the $19,984.43 check made out to Desmond, Graham and Liberty into the registry of the court. Desmond also asked the trial court to enter an order requiring Liberty to pay a pro rata share of her attorney fees ($6,661.48) and costs ($623.15) for a total of $7,284.63.

Graham submitted an affidavit to the trial court in support of Desmond's attorney fees. Graham asserted that the prosecution of Desmond's claim resulted in his expending more than an estimated 225 hours of legal work and litigation costs of $1,869.46. This total included Graham's work on the PIP arbitration, the UIM action against Liberty and the personal injury action against Larson.

Graham took the position that although Liberty did not agree to have him obtain Liberty's PIP payments from Larson's carrier, Liberty's efforts had been insufficient to secure repayment. Graham claimed that it was necessary for him to expend substantial time and effort persuading Larson that Desmond's injuries were proximately caused by the accident. In addition, Liberty did not substantiate to Allstate that its PIP payments were for injuries sustained

in the accident with Larson or that Desmond's bills were reasonable. In fact, in the PIP arbitration, Liberty had taken the same position Larson took, *i.e.*, that Desmond's injuries were *not* proximately caused by the accident. Thus, Graham asked the court to conclude that his services benefited Liberty and were reasonably necessary to its recovery.

Liberty, on the other hand, contended that the terms of Desmond's insurance policy with Liberty and RCW 7.04 governed the UIM arbitration and that neither allowed the trial court to award attorney fees in a UIM action for a subrogation lien collected in a lawsuit filed against a third party tortfeasor. In addition, Liberty asserted that Graham's fees derived from the suit against Larson and would have been incurred regardless of Liberty's subrogated interest. Liberty took the position that it would have collected its subrogation lien from Allstate even in the absence of Desmond's suit against Larson. Liberty thus argued to the trial court that it did not benefit from Graham's work and that Graham's efforts were not reasonably necessary to its recovery from Allstate.

On October 19, 1990, the trial court ordered Liberty to pay the attorney fees and costs Desmond requested. The trial court ordered the $19,984.63 check to be paid into the registry of the court. The trial court also ordered that Liberty receive a check for $12,699.60 and that Graham receive a check for $7,284.63.

Liberty appeals.

## II

On appeal, Liberty first contends that the trial court lacked jurisdiction to rule on Desmond's motion to assess attorney fees. A challenge to the court's jurisdiction may be raised for the first time on appeal. RAP 2.5(a). Although Liberty attempts to characterize its contention as jurisdictional, its claim is without merit.

The essential elements of jurisdiction are threefold:

(1) the court must have cognizance of the class of cases to which the one to be adjudged belongs; (2) the proper parties

must be present; and (3) the point decided must be, in substance and effect, within the issues before the court.

*State ex rel. New York Cas. Co. v. Superior Court*, 31 Wn.2d 834, 840, 199 P.2d 581 (1948).

█ Liberty does not claim that the trial court lacked jurisdiction over the subject matter of Desmond's claim for attorney fees against Liberty. Furthermore, at oral argument, Liberty conceded that the proper parties were before it. Liberty apparently contends that the third element of jurisdiction is absent because Graham's fees incurred in Desmond v. Larson are not within the issues of the underinsured action, Desmond v. Liberty. Therefore, Liberty contends, Desmond must file a separate action against Liberty to address the question of fees. We disagree.

As Liberty concedes, the issue of whether Liberty should contribute to payment of Desmond's attorney fees to Graham may be litigated under Desmond's name. Liberty's only complaint is, in essence, that the trial court erred in allowing Desmond to add another issue in her UIM action against Liberty. This does not implicate a jurisdictional issue. Although Desmond did not formally move to amend her pleading in the UIM action, her motion to add the claim for attorney fees from the negligence suit to the UIM action was the constructive equivalent.[1]

### III

Liberty next contends that the trial court erred in granting Desmond's motion to recover a portion of her attorney fees because Liberty did not benefit from Graham's efforts and because Graham's efforts were not reasonably necessary to its recovery.

In *Pena v. Thorington*, 23 Wn. App. 277, 595 P.2d 61, *review denied*, 92 Wn.2d 1019 (1979), an insured recovered

---

[1]Liberty does not assign error to the trial court's ruling allowing Desmond to add her attorney fees claim. In any event, allowing amendments is within the trial court's discretion and permission to amend "shall be freely given when justice so requires." CR 15(a); *Culpepper v. Snohomish Cy. Dep't of Planning & Comm'ty Dev.*, 59 Wn. App. 166, 169, 796 P.2d 1285 (1990), *review denied*, 116 Wn.2d 1008 (1991).

damages from a tortfeasor for injuries incurred in an auto accident. Pena's attorney offered to represent the first party insurer in obtaining repayment for its PIP payments to the insured. The insurer declined the offer, and, in fact, expressly disassociated itself from Pena's personal injury action. It then sought a guarantee from the third party insurer for payment for its subrogation interest and forwarded medical bills directly to the third party insurer. *Pena*, 23 Wn. App. at 278-79.

The court held for the insurer and denied the insured's claim for attorney fees, concluding that the efforts of Pena's attorney did not benefit the first party insurer because neither insurer had challenged liability. The court also noted that the first party insurer declined Pena's offer of representation and instead actively pursued its claim itself. The court concluded that Pena's attorney had been motivated to secure adequate recovery for his client and thereby attorney fees for himself, not reimbursement for the first party insurer. However, the *Pena* court acknowledged that where an insured's attorney benefits the subrogee, and where the attorney's efforts are "reasonably necessary" to its recovery, the insured may recover a pro rata share of his attorney fees from the first party insurer. *Pena*, 23 Wn. App. at 281-82.

Here, the record was inadequate to allow the trial court to determine whether Graham's efforts benefited Liberty or were reasonably necessary to Liberty's recovery. Although proof of the causal connection was necessary to *Desmond's* recovery, it may not have affected *Liberty's* subrogation rights. We therefore remand to the trial court to take such further evidence as will permit it to properly make this determination. In order to decide whether Liberty would have recovered its subrogation claim without Graham's efforts, the trial court should consider, among other things, the specific language of Desmond's insurance policy with Liberty. The policy's terms may detail the relative responsibilities of each party with regard to Liberty's recoupment of its PIP payments and may expressly state how their respec-

tive interests interplay. The trial court should also consider any agreements, contractual or otherwise, between Liberty and Allstate which would bear on the issue of whether efforts by any other third parties were necessary in order for Liberty's interest to be protected. The interrelationship between insurers might be probative of whether Graham's efforts were necessary to Liberty's recovery.

If the trial court finds that Graham is entitled to his fees, it must then determine whether the amount he requests is reasonable. In order to do so, the trial court may determine that more detailed fee affidavits from Graham are necessary both for substantiation and segregation of his attorney fees claim.

Reversed and remanded.

BAKER, J., concurs.

FORREST, J. (concurring) — I concur with the majority that the trial court had jurisdiction to determine the issue as to payment of attorney fees and that the case must be remanded for detailed findings. However, I doubt that the facts are actually in dispute and I would anticipate that the ultimate issue as to whether the facts justify recovery will be a legal one. For that reason I believe a further discussion of the applicable law to be in order.

Washington law on the subject starts with *Pena v. Thorington*.[2] Although Desmond relies almost exclusively on *Pena*, that case actually held that the insured was not entitled to recover on facts substantially equivalent to those here present. In doing so, the court adopted the Oregon rule as stated in *Ridenour v. Nationwide Mut. Ins. Co.*, 273 Or. 514, 516, 541 P.2d 1377, 1378 (1975):

> [A]n insurer who makes a recovery from a third party for moneys paid its insured is only required to pay attorney fees which were "reasonably and necessarily incurred" to make the recovery. Absent an agreement to the contrary, an insurer is only obligated for attorney fees if it is benefited.

[2]23 Wn. App. 277, 281, 595 P.2d 61, *review denied*, 92 Wn.2d 1019 (1979).

The court then stated that whether the services were "necessary" was a question of fact. In my view, the facts consist of the dealings between the insured's attorney and his PIP carrier, and the dealings between the PIP carrier and the liability carrier. "Necessary" is a conclusion of law.

The next Washington case, *Richter, Wimberley & Ericson v. Honore*,[3] denied attorneys fees from the PIP carrier, holding that the issue was controlled by the following language from the insured's PIP policy:

"6. TRUST AGREEMENT. . . .
". . . .
"(b) where the insured has incurred legal expenses in recovering from a third party, payments made by the Company, under this endorsement, and out of which recovery the Company is reimbursed for such payments under the Subrogation Provision of the policy, the Company shall pay an equitable apportionment of such expense. *This provision shall not apply as to amounts recovered or recoverable by the Company from another insurer pursuant to the Inter-Company Arbitration Agreements;*

(Italics mine.) *Richter*, at 508 n.1. It reached this result by interpreting key language from *Ridenour*, "[a]bsent an agreement to the contrary, an insurer is only obligated for attorney fees if it is benefited",[4] to mean "in the presence of an agreement to the contrary between the insured and the PIP carrier, the PIP carrier is not liable for attorney fees." Whether this is a logical application of the *Ridenour* language may be open to question, but if Desmond's PIP policy contains language equivalent to that in *Richter*, *Richter* would control and require denial of attorney fees.

Absent such policy language, the trial court must find other relevant facts and examine their legal significance in the light of *Pena* and *Richter*. Indeed, the *Richter* court went on to consider whether the services of the attorney were "necessary" as an additional ground for its decision. It considered the issue resolved by a trial court finding that

---

[3] 29 Wn. App. 507, 628 P.2d 1311 (1980), *review denied*, 95 Wn.2d 1012 (1981).

[4] *Ridenour*, at 516.

the PIP carrier had received "no benefit" from action taken by the insured's attorneys. In my view, that too is a conclusion of law rather than a finding of fact. Be that as it may, the underlying evidence relied upon in *Richter* was that there was no agreement between the attorney and the PIP carrier, and there was an indication that the liability carrier recognized the PIP carrier's claim. *Richter*, at 511. There appears to be little to distinguish the facts here from the facts of *Pena* and *Richter*, but that remains to be determined by the trial court.

The *Richter* court also noted that the insured had agreed to pay one-third of "any settlement" to his attorney, that he voluntarily agreed to the PIP carrier's right of subrogation by purchasing the policy and, accordingly, had no cause for complaint, receiving the benefit of both his bargains. *Richter*, at 512 n.5. Although consigned to a footnote, I consider this very significant because it focuses on the ultimate issue underlying these lawsuits: should *any* attorney fees be paid when the PIP subrogation funds are included in a settlement or a judgment and if so, who should pay — the insured or the PIP carrier?

*Pena* and *Richter* recognize recovery of attorney fees from the PIP carrier as a legal possibility. However, I find serious conceptual difficulties in placing responsibility for the attorney fees on the PIP carrier.

First, in this case Graham was required to perform all the same services on behalf of his client regardless of whether there was a PIP obligation or not. He has identified nothing that he would have done differently without his client's receipt of the PIP payments.

Second, the attorney-client relationship must be consensual. It is highly questionable whether in the face of Liberty's rejection of Graham's offer of his services that the court should impose a liability for those same rejected services. Moreover, Graham has acted adversely to Liberty in regard to the continuance of the PIP payments and in regard to UIM coverage.

Third, Graham's claim is necessarily based on his performing services for both Liberty and Desmond. However, such a claim of dual representation would involve a potential conflict of interest contrary to the Rules of Professional Conduct. This is demonstrable by a simple hypothetical. Assume (1) a case with substantial damages and very thin liability; (2) $20,000 in PIP payments to the injured plaintiff; (3) an offer by the liability carrier to settle for $39,000. Any independent attorney representing the PIP carrier would wish to accept such settlement since it would produce a full recovery (less attorney fees) of the PIP payments. However, an attorney representing the injured plaintiff might well recommend that the plaintiff go to trial in hopes of a substantial recovery, knowing that in the event of no recovery there would be no obligation to repay the PIP payments.

Although not before us in this appeal, the issue as to the client's obligation to pay attorney fees from the PIP payments might arise on remand. There is a suggestion in *Richter* that the plaintiff's agreement to pay his attorney a percentage of "any settlement" means that he is to pay one-third of the PIP payments.[5] While I agree with the *Richter* holding as to the effect of the policy language, I do not accept its dicta as to the client's obligation. An insured has an unequivocal legal right to receive PIP payments. To me it is anomalous to require him to pay a percentage of that sum to his attorney merely because in the course of litigation or negotiation the liability carrier reimburses the PIP carrier for those sums. At an absolute minimum, such a

---

[5]"Because the foregoing rationale results in a determination that attorney's fees cannot be recovered by Mr. Honore, the fact the court indicated Mr. Honore had not been made whole to the extent of those fees is immaterial. We note Mr. Honore voluntarily entered into a contingent retainer agreement which required payment of 33⅓ percent of 'any settlement.' There have been no contentions of invalidity concerning that agreement or that he was operating under any disability when he entered it. Additionally, the PIP endorsement was voluntarily bargained for by Mr. Honore in order to have his medical bills promptly paid. He received the benefit of both bargains and should not now be heard to complain." *Richter*, at 512 n.5.

fee agreement would require full disclosure by the attorney to the client as to all the relevant facts and circumstances.

I find serious policy objections against, and no very compelling policy reason for, imposing attorney fee liability for PIP payments on either the client or the PIP carrier. However, these issues are not briefed and it is unnecessary to resolve them in the present appeal.