957 P.2d 632 (1998)
135 Wash.2d 398
Elaine MAHLER and Jack Mahler, wife and husband, Respondents,
v.
George G. SZUCS, Defendant, and
State Farm Mutual Automobile Insurance Company, Petitioner.
Monica FISHER, Petitioner,
v.
ALDI TIRE, INC., a Washington corporation; Douglas Krie; Don and Laura Tinsley, husband and wife, Defendants, and
State Farm Mutual Automobile Insurance Company, an Illinois corporation, Respondent.
Nos. 64344-0, 65014-4.
Supreme Court of Washington, En Banc.
June 4, 1998.
*636 Reed McClure, by William R. Hickman and Michael S. Rogers, Seattle, Todd & Wakefield, by Scott C. Wakefield, Seattle, and Julin, Fosso, Sage, McBride & Mason, by Harold C. Fosso, Seattle, for petitioner/respondent State Farm Mutual Automobile Insurance Co.
Law Offices of Patrick H. LePley, Inc., P.S., by Patrick H. LePley, Bellevue, and Charles K. Wiggins, Bainbridge Island, for petitioner Fisher.
Law Offices of Patrick H. LePley, Inc., P.S., by Patrick H. LePley; Richard B. Kilpatrick, P.S., by Richard B. Kilpatrick, Bellevue, Charles K. Wiggins, Bainbridge Island, and Fury Bailey, by William S. Bailey, Seattle, for respondents Mahler.
Bryan P. Harnetiaux, Gary N. Bloom, and Debra L. Stephens on behalf of Washington State Trial Lawyers Association, Spokane, amicus curiae.
Daniel P. Mallove and Michael L. Schrenk on behalf of Grange Insurance Association, Seattle, amicus curiae.
Alan L. Bunge and Kathryn A. Majnarich on behalf of United Services Automobile Association, Seattle, amicus curiae.
Sidney R. Snyder, Jr., and Ronald S. Dinning on behalf of Washington Insurers, Seattle, amicus curiae.
Robert H. Madden, Carol J. Molchior, and J. Richard Crockett on behalf of Arbitration Forums, Inc., Seattle, amicus curiae. *633 *634
*635 TALMADGE, Justice.
In this case we analyze an insurer's right to recover payments made to an insured pursuant to a Personal Injury Protection (PIP) provision in a liability insurance policy when an insured recovers against a tortfeasor. Specifically, we are asked to determine the extent to which the insurer, State Farm Mutual Automobile Insurance Company (State Farm), must pay the insured a share of the expenses the insured incurred to recover from the tortfeasor. We hold State Farm's policy required it to pay its insureds a portion of their expenses necessary to obtain a recovery from the tortfeasors. State Farm was not obligated to pay prejudgment interest on Mahler's expenses, but it was obligated to pay Mahler's attorney fees to enforce this sharing of expenses. We remand the case to the trial court for entry of findings of fact and conclusions of law with respect to the reasonable amount of such fees.

*637 ISSUES
1. Does State Farm's policy require it to pay a share of its insured's expenses required to secure a recovery from a tortfeasor when such recovery is the basis for State Farm's PIP reimbursement?
2. Did the trial court err in awarding prejudgment interest to Mahler?
3. Did the trial court in Mahler err in allowing Mahler to recover attorney fees incurred in this action?

FACTS
A. Mahler
On January 4, 1993, Dr. George Szucs pulled out into traffic from a driveway and hit Elaine Mahler's car. He was cited for failure to yield right of way. Mahler sustained cervical and thoracic sprains, and contusions of her forehead, chest, and right knee. She later suffered from muscle inflammation and spasm, neck, low back, and hip pain, and persistent headaches for which she received chiropractic and physical therapy treatments. Although she claimed to have incurred $8,680 in medical expenses, State Farm paid only $4,173.32 under her PIP coverage, refusing further payments after an examination by a physician State Farm hired concluded no further active treatment was indicated.
Three days after the accident, State Farm sent her a letter that stated: "If you should recover our interest from the responsible party or their [sic] insurance carrier, you must protect our reimbursement rights." Mahler Clerk's Papers at 32. Two months later, Mahler's attorney notified State Farm he was representing Mahler and acknowledged State Farm's "lien for PIP benefits extended in this matter." Mahler Clerk's Papers at 206. State Farm replied it intended to arbitrate the question of its reimbursement with the defendant's insurer and asked Mahler's attorney to "take no action whatsoever in connection with the recovery of State Farm's claim against the adverse party or insurance company." Mahler Clerk's Papers at 34. State Farm subsequently did not assist Mahler in her claim against Szucs.
Mahler, in the meantime, prosecuted her case against Szucs. She filed a complaint; she submitted interrogatories; she prepared for and attended a mediation hearing; she negotiated and entered into a settlement agreement. Szucs defended Mahler's claims vigorously. In his brief for the mediation hearing, he said:
Liability is an open question.... It seems likely that a jury will find that both parties are partially responsible for this accident.... We anticipate that a jury will relate at least a third of the claimed treatment to pre-existing or unrelated problems and that the general damages award will be rather moderate. Defendant believes that the injuries sustained by Mrs. Mahler in the accident of January 4, 1993 were an aggravation of a long-standing, pre-existing problem.
Mahler Clerk's Papers at 20-21. Despite the assertion of these defenses, Szucs eventually agreed to settle with Mahler for $24,250. As is typical in settlement and release agreements, Mahler agreed to hold Szucs and American States, Szucs' insurer, harmless from all claims growing out of the accident. From the settlement proceeds, Mahler's attorney placed the full amount of State Farm's PIP benefits advanced into his trust account, reciting in his settlement statement to Mahler this amount would be "[r]eserved until amount of subrogation is resolved." Mahler Clerk's Papers at 431.[1]
A week before the parties executed the settlement agreement, Mahler's attorney informed State Farm it was obligated to give Mahler a credit for expenses necessary to obtain the recovery of State Farm's PIP benefits advanced. State Farm responded negatively: "We will not accept having your services unilaterally forced upon us for a fee that we have not agreed to." Mahler Clerk's Papers at 262.
Until Mahler settled her case on May 13, 1995, State Farm had not attempted to recover its PIP payments from American *638 States, and only on June 20, 1995, more than a month after the settlement agreement, did State Farm finally file a claim against American States for the $4,173.32. American States responded by denying liability. Ultimately, a private arbitration panel under the auspices of the insurance companies' inter-company arbitration agreement met and decided in favor of State Farm, against American States, commenting: "Respondent [American States] did not protect the Applicant's [State Farm's] interest." Mahler Clerk's Papers at 272.
In the meantime, Mahler proceeded with a series of motions in the trial court to obtain a declaration State Farm owed her a credit against the recovered PIP payments retained in Mahler's attorney's trust account. Ultimately, a mandatory arbitration hearing occurred, and the arbitrator awarded Mahler an attorney fee credit of $1,391.10 against the PIP funds in the trust account.
State Farm requested a trial de novo. Once back in superior court, Mahler and State Farm both filed cross-motions for summary judgment. The trial court entered a judgment in Mahler's favor, awarding Mahler $1,612.59 as an offset for her expenses in recovering State Farm's PIP payments,[2] and also awarded Mahler attorney fees for having to litigate her rights to obtain the benefits of her insurance policy, but the trial court did not enter findings of fact or conclusions of law supporting the award.
Both Mahler and State Farm sought direct review, RAP 4.2(a), which we accepted, consolidating the case with Fisher. Amici briefs have been submitted by the Washington State Trial Lawyers Association (WSTLA), six auto insurers doing business in Washington, and by Arbitration Forums, Inc., a firm that conducts the intercompany arbitrations at issue here and in Fisher.
B. Fisher
Defendant Aldi Tire's truck crashed into Monica Fisher's car when she was stopped on a state highway south of the city of Snohomish waiting to make a left turn into a residential driveway. Her car was a total loss and she suffered cervical and lumbar injuries. She missed a month of work. State Farm paid part of her medical expenses and wage loss under its PIP coverage provision. Fisher retained an attorney to pursue an action for general damages against the tortfeasor.
Six months before Fisher filed a complaint against the tortfeasor, State Farm wrote her a letter, with a copy to her attorney, saying, "If you should recover our [First Party Benefit payments] from the responsible party or their [sic] insurance carrier, you must protect our reimbursement rights." Fisher Clerk's Papers at 309. There is nothing in the record to indicate State Farm asked Fisher not to attempt to recover State Farm's PIP payments to Fisher.
Fisher's attorney exerted significant efforts to establish liability. He took the deposition of the state trooper who investigated Fisher's accident, and prepared an 18-page memorandum of law and supporting affidavits for a summary judgment motion. After putting Fisher through the expense of preparing the motion, the attorney for the defendant's insurance carrier, Federated Service Insurance Company (Federated), advised Fisher's attorney the defendant would not contest liability, and asked him to prepare a stipulated order granting partial summary judgment as to liability.
Two years later, with the case set for trial, Fisher's attorney informed State Farm that after doing everything "but hammer at the gates of hell," he was close to settlement with *639 Federated for between $35,000 and $45,000. Fisher Clerk's Papers at 319-20 He said he did not intend to give State Farm the total amount of PIP benefits it paid for Fisher's treatments and wage loss "without you[r] paying some consideration for the fact that I have had to battle the insurance carrier for the defendants every step of the way, both on liability and the reasonableness and necessity of this lady's medical treatment." He suggested a fair amount for State Farm to pay out, of the more than $12,000 in PIP payments he would recover by settlement with Federated, would be $3,900. State Farm replied it would not "compromise our subrogated interest" and intended to collect directly from Federated. Fisher Clerk's Papers at 326. State Farm repeated this position in another letter.
State Farm took no action to aid Fisher in bringing the case to a settlement posture.[3] Federated refused State Farm's demand for recovery of State Farm's PIP payments, not because it contested liability, but because it had already paid Fisher's settlement amount and would not pay twice for State Farm's PIP recovery. State Farm did not invoke inter-company arbitration with Federated.
The parties settled. Fisher requested the amount of State Farm's PIP payments from the settlement amount$12,223.53be placed in the registry of the court so as not to delay execution of the settlement agreement, and the court so ordered. The trial court entered an order of dismissal on June 7, 1994. Thereafter, Fisher instituted a complaint in interpleader to decide the fate of the funds held in the registry of the court. On cross-motions for summary judgment, the trial court agreed with State Farm and ordered the entire amount to be disbursed to State Farm, without any payment to Fisher.
Fisher appealed, and the Court of Appeals reversed. Fisher v. Aldi Tire, Inc., 78 Wash. App. 902, 902 P.2d 166 (1995), review denied, 128 Wash.2d 1025, 913 P.2d 816 (1996). The court held the policy language controlled over any principles of equitable subrogation to the contrary, so that State Farm did not have to pay for Fisher's efforts in recovering the PIP payments pursuant to specific policy language. Id. at 909, 902 P.2d 166. The court then addressed the provisions of the State Farm policy itself to determine whether the PIP payments were actually "recoverable" as a matter of fact at arbitration, disagreeing with State Farm's contention that simply entering into the intercompany arbitration agreement established the recoverability of the PIP payments. The court said:
Thus, in the present circumstances, if inter-company arbitration works merely as a rubber stamp of personal injury litigation, subrogated funds are not, in reality, recoverable through inter-company arbitration. If arbitration is not the vehicle that provides recovery, the limitation in the insurance policy would not apply and State Farm would be obligated to share responsibility for attorney fees a set forth in the policy.
Because the court's holding mandated a factual inquiry into whether inter-company arbitration was the "vehicle that provide[d] recovery," the court remanded the case to the trial court. Id. at 909-10, 902 P.2d 166.
On remand, the trial court entered summary judgment in favor of State Farm, holding State Farm's PIP payments were recoverable through intercompany arbitration "but for the interference by the insured's attorney." Fisher Clerk's Papers at 7. Fisher sought direct review, State Farm supported the request, and we granted direct review, RAP 4.2(a), consolidating this case with Mahler.

ANALYSIS
We are confronted in these cases with a series of practical and theoretical concerns in interpreting State Farm's policy provisions regarding reimbursement for PIP benefits advanced to insureds and whether State Farm must share with its insureds the expenses necessary to secure recoveries from tortfeasors. However, the issues in this case *640 so starkly divide the plaintiffs' personal injury bar on the one hand, and the insurance industry and the insurance defense bar on the other, both sides are often emotional and not well-focused on the real issues at stake in this case. For this reason, it is useful to resort to basic principles to resolve the issues here.
A. State Farm's Right to Reimbursement for PIP Payments Advanced
General Principles
All of the parties have argued subrogation principles resolve the issues in these cases. Subrogation is an equitable doctrine the essential purpose of which is to provide for a proper allocation of payment responsibility. It seeks to impose ultimate responsibility for a wrong or loss on the party who, in equity and good conscience, ought to bear it. RONALD C. HORN, SUBROGATION IN INSURANCE THEORY AND PRACTICE 3 (1964). Two law review commentators have referred to this allocation rationale as stemming from "the moralistic basis of tort law as it has developed in our system." Spencer L. Kimball & Don A. Davis, The Extension of Insurance Subrogation, 60 MICH. L. REV. 841, 841 (1962).[4] "The general purpose of subrogation is to facilitate placement of the financial consequences of loss on the party primarily responsible in law for such loss." HORN, supra, at 24.
Subrogation has existed in civil law longer than in common law. HENRY N. SHELDON, SUBROGATION 3 (2d ed. 1893); James Morfit Mullen, The Equitable Doctrine of Subrogation, 3 MD. L. REV. 201, 201 (1939). It applies in cases involving multiple claims upon the same property, suretyship,[5] joint debtors, parties to bills and notes, the administration of estates, and contracts of insurance. Subrogation is favored in Washington law. "Subrogation is always liberally allowed in the interests of justice and equity." J.D. O'Malley & Co. v. Lewis, 176 Wash. 194, 201, 28 P.2d 283 (1934).
There are, in effect, two features to subrogation. The first is the right to reimbursement. The second is the mechanism for the enforcement of the right. The right to reimbursement may arise by operation of law, termed legal or equitable subrogation, or by contract, called conventional subrogation. Ross v. Jones, 174 Wash. 205, 216, 24 P.2d 622 (1933).
The more troublesome question is the precise enforcement mechanism for the subrogee's right of reimbursement. Considerable imprecision on this question is present in case law on subrogation. By virtue of payments made to a subrogor stemming from the actions of a third party, a subrogee has a right of reimbursement under general subrogation principles. That reimbursement may be enforced as a type of lien against any recovery the subrogor secures from the third party. Alternatively, the subrogee, standing in the shoes of its subrogor, may pursue an action in the subrogor's name against the third party to enforce the reimbursement right.
In the insurance context, the "doctrine of subrogation enables an insurer that has paid an insured's loss pursuant to a policy ... to recoup the payment from the party responsible for the loss." Elaine M. Rinaldi, Apportionment *641 of Recovery Between Insured and Insurer in a Subrogation Case, 29 TORT & INS. L.J. 803, 803 (1994). Traditionally, subrogation in the context of insurance concerned cases of marine and fire losses. In a typical case of a fire loss, upon payment of the loss to the insured, the property insurer would be subrogated to the extent of its payment to the remedies of the insured against the party that caused the loss. This traditional application of subrogation principles is in accord with the policy of allocating to the causer of the loss the cost of reimbursing the person (the insurer) who paid for the loss. Property loss subrogation caused few disputes between the insurer and the insured, because once the insured had recovered from the insurer the economic value of the loss, the insured had little or no interest in competing with the insurer for the right to sue the tortfeasor; economic damages could make the insured whole.
It has been only in the last 30 to 40 years that subrogation disputes regarding personal injury cases have arisen. "During this period, subrogation clauses have been inserted in first party medical payments coverage in automobile policies, uninsured and underinsured motorist coverage, and medical and hospitalization coverages." Roger M. Baron, Subrogation on Medical Expense Claims: The "Double Recovery" Myth and the Feasibility of Anti-Subrogation Laws, 96 DICK. L. REV. 581, 583 (1992).[6] In the personal injury context, where insureds may wish to pursue claims for noneconomic damages, i.e., pain and suffering, disputes regarding the right to subrogation have proliferated.
The complexities are readily apparent. By contrast with a property loss case, where the damages are all economic and usually readily determinable, so that the insured can be made whole by the payment of money, in a personal injury case, the claimed noneconomic damages typically amount to many multiples of the economic damages and are almost always disputed because they are not objectively ascertainable. Thus, rather than stepping aside and allowing the insurer to pursue the tortfeasor by means of subrogation for the money it paid its insured, the injured insured will often sue the tortfeasor to recover noneconomic damages, and include in the claim the medical expenses and other special damages he or she has incurred as a result of the injury. In effect, the injured insured does not abandon its shoes, and its insurer thus has no shoes to step into to pursue subrogation.
The potential for conflict of interest abounds in such circumstances. Both insurer and insured, having entered into an insurance contract, are bound by the common law duty of good faith and fair dealing, as well as the statutory duty "to practice honesty and equity in all insurance matters." RCW 48.01.030. We have said the statute creates a fiduciary duty for insurers running to their insureds. Industrial Indem. Co. of the Northwest, Inc. v. Kallevig, 114 Wash.2d 907, 916-17, 792 P.2d 520 (1990). Yet the injured insured seeks recovery from the tortfeasor, the same source to which the insurer may look to recover its payments to its insured.[7]
As a result of these new conflicts, some courts initially refused to allow subrogation in the personal injury context, basing their denials on the common law rules against splitting causes of action and assigning personal *642 injury claims. Baron, supra, at 583 (citing cases). Most jurisdictions, however, now allow subrogation. J.A. Bock, Annotation, Subrogation Rights of Insurer Under Medical Payments Provision of Automobile Insurance Policy, 19 A.L.R.3d 1054.
We have dealt with some of these difficulties as they have arisen since the advent of subrogation in insurance contracts involving personal injury claims. In general, the right of reimbursement in the insurance setting may arise by contract or equitable means. The right may be enforced contractually by an insurer's right to recover from the insured the amount of payments made from any recovery the insured secures from a third party tortfeasor or by a legal action in the name of the insured against the tortfeasor.[8] We have articulated basic principles of subrogation in the insurance setting in three decisions: Metropolitan Life Ins. Co. v. Ritz, 70 Wash.2d 317, 422 P.2d 780 (1967); Thiringer v. American Motors Ins. Co., 91 Wash.2d 215, 588 P.2d 191 (1978); and Leader Nat'l Ins. Co. v. Torres, 113 Wash.2d 366, 779 P.2d 722 (1989).
In Metropolitan Life, the insurer paid medical benefits to the insured, pursuant to a group policy which contained a subrogation provision. Nevertheless, the insured entered into a complete release of all claims against a third party tortfeasor without specifically referencing the insurer's interest. We stated the general release "deprived" the insurer of subrogation rights, noting the insurer "was entitled either to reimbursement from [the insured] or to be subrogated to [the insured's] claim for medical expenses against the tort-feasor." Metropolitan Life, 70 Wash.2d at 321, 422 P.2d 780. The Court held the insurer could secure reimbursement from the insured's recovery from the tortfeasor, subject to the insurer's obligation to share proportionately in the insured's expenses incurred to obtain the settlement.
In Thiringer, an insurer refused to pay PIP benefits to an insured, and the insured settled with a tortfeasor. The insured then demanded PIP benefits because his damages exceeded the amount of the settlement. The trial court held the settlement reasonable and the insurer's subrogation rights were not prejudiced by it. The trial court held further that the settlement amount was to be first applied to the insured's general damages and then, if any excess remained, toward the payment of the special damages to which the insurer's PIP coverage applied. We held the insured's release did not prejudice the insurer's subrogation right so as to invalidate the insured's right to PIP benefits, noting Thiringer, 91 Wash.2d at 219, 588 P.2d 191:
the policy quite reasonably contemplates that the insured may pursue his remedy against a third party, and the only restriction is that he must not do any act to prejudice the rights of the insurer. Since the losses covered by the PIP provision may represent only a minor portion of an insured's total damage, it would be patently unfair to require him to surrender his right of action against a third party in order to receive this payment. Also, it is unrealistic to expect that a third party will accept only a partial release when he settles a claim, under circumstances such as those presented here.
Moreover, with respect to the allocation of benefits, we articulated a rule of full compensation, that is, no right of reimbursement existed for the insurer until the insured was fully compensated for a loss:
The general rule is that, while an insurer is entitled to be reimbursed to the extent that its insured recovers payment for the same loss from a tortfeasor responsible for the damage, it can recover only the excess which the insured has received from the wrongdoer, remaining after the insured is fully compensated for his loss.
This rule embodies a policy deemed socially desirable in this state, in that it fosters the adequate indemnification of innocent automobile accident victims.
Thiringer, 91 Wash.2d at 219-20, 588 P.2d 191 (citations omitted). Thiringer is in accord with the great majority of jurisdictions *643 in following this "full compensation for the insured" rule. Rinaldi, supra, at 807.
Finally, in Leader Nat'l, the insured received $10,000 in medical payments under a PIP policy provision. The insured then sought $5,211.10 in unreimbursed special damages and general damages from a tortfeasor, ultimately settling with the tortfeasor for a total of $10,000. Both the insured and the tortfeasor were aware of the insured's subrogation right, the insurer did not consent to the settlement, and the tortfeasor had additional assets. Under these circumstances, we held the settlement between the insured and the tortfeasor did not extinguish the insurer's subrogation right against the third party tortfeasor. We held the risk of loss in such a context must be borne, not by the insured, but by the tortfeasor or the insurer. Leader Nat'l, 113 Wash.2d at 372, 779 P.2d 722. See also Bierce v. Grubbs, 84 Wash.App. 640, 929 P.2d 1142 (1997) (acceptance of CR 68 offer of judgment prejudiced insurer's subrogation right and insurer could pursue reimbursement from insured once insured was fully compensated).
These cases are consistent with the general view that subrogation creates in the insurer, by contract or equity, a right to be reimbursed. The enforcement of the interest, whether by a type of lien against the subrogor/insured's recovery from a tortfeasor or by an action by the subrogee/insurer in the name of the insured against the tortfeasor, is governed by the general public policy of full compensation of the insured, tempered by the principle that the insured and/or a tortfeasor may not knowingly prejudice the right of the insurer to be reimbursed.
With these principles at hand, we proceed to discuss the issues in the present cases.
B. State Farm's Policy Language
The State Farm policy language with respect to recovery of its PIP payments and the sharing of expenses is essentially identical in both the Mahler and Fisher policies. In the "Conditions" section of the policy, under the heading, "Our Right to Recover Our Payments," the following language appears:
a. Medical payments, death, dismemberment and loss of sight and total disability coverage payments are not recoverable by us.
b. Under personal injury protection and underinsured motor vehicle coverages, we are subrogated to the extent of our payments to the proceeds of any settlement the injured person recovers from any party liable for the bodily injury or property damage.
If the person to or for whom we have made payment has not recovered our payment from the party at fault, he or she shall:
(1) keep these rights in trust for us and do nothing to impair them;
(2) execute any legal papers we need; and
(3) when we ask, take legal action through our representative to recover our payments.
We are to be repaid our payments, costs and fees of collection out of any recovery.
c. Under all other coverages the right of recovery of any party we pay passes to us. Such party shall:
(1) not hurt our rights to recover; and
(2) help us get our money back.
d. If the insured recovers from the party at fault and we share in the recovery, we will pay our share of the legal expenses. Our share is that percent of the legal expenses that the amount we recover bears to the total recovery. This does not apply to any amounts recovered or recoverable by us from any other insurer under any inter-insurer arbitration agreement.
Our right to recover our payments applies only after the insured has been fully compensated for the bodily injury, property damage or loss.
Paragraph b of the State Farm policy establishes State Farm's right to reimbursement, but it articulates two distinct mechanisms for enforcement of the right.
In the first paragraph of Paragraph b, the phrase "[w]e are subrogated to the extent of *644 our payments to the proceeds of any settlement the injured person recovers from any party liable for the bodily injury or property damage" is significant. First, this phrase refers only to the proceeds of settlements, and not to the proceeds of any judgments the insured might obtain. Second, the phrase speaks of the "proceeds of any settlement," thereby suggesting State Farm's contractual right to recover payments from its insureds under PIP or UIM coverage arises only after settlement. There are obviously no proceeds of a settlement until the settlement occurs.
The policy language says State Farm is "subrogated" to those proceeds. The meaning here is indistinct. "No right of subrogation can arise in favor of an insurer against its own insured since, by definition, subrogation exists only with respect to rights of the insurer against third persons to whom the insurer owes no duty." Stetina v. State Farm Mut. Auto. Ins. Co., 196 Neb. 441, 243 N.W.2d 341, 346 (1976); 16 GEORGE J. COUCH, INSURANCE § 61:136, at 195-96 (2d ed.1983). This language plainly does not contemplate State Farm will step into the shoes of its insureds and pursue their claims against the tortfeasors. Instead, State Farm has simply contracted for a right to reimbursement of its PIP payments from its insureds from the proceeds of a settlement.[9]
The Supreme Court of Oregon considered nearly identical policy language in State Farm Mut. Auto. Ins. Co. v. Pohl, 255 Or. 46, 464 P.2d 321 (1970). The State Farm policy provided:
Upon payment ... the company shall be subrogated to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery which the injured person or anyone receiving such payment may have against any person or organization and such person shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. Such person shall do nothing after loss to prejudice such rights.
Id. 464 P.2d at 322 (alteration in original). The specific issue before the Oregon court was whether this language created a right of subrogation in State Farm. The court held it did not: "The literal language of the clause only purports to transfer an interest in moneys after they become the property of the insured. The clause creates a right in the proceeds, not against the tortfeasor." Id. at 324. We agree.
By contrast, in the second paragraph of Paragraph b and in Paragraph c, State Farm contracted with its insureds for a traditional subrogation right to recover payments made to its insureds. In the second paragraph of Paragraph b, State Farm indicated it would "take legal action through our representative to recover our [PIP or UIM] payments" when "the person to or for whom we have made payment has not recovered our payment from the party at fault." Thus, State Farm has reserved a traditional subrogation right to sue in the shoes of the insured only when it makes PIP payments to the insured and the insured does not pursue a tortfeasor. Similarly, Paragraph c quoted above succinctly creates a subrogation right: "Under all other coverages the right of recovery of any party we pay passes to us." This assignment of rights is a proper, classical subrogation clause.
Thus, by its terms Paragraph b creates a contractual right of reimbursement, not a right to subrogation, when an insured pursues an action or seeks recovery from a tortfeasor.[10] With this understanding of State Farm's insurance contract, we proceed to the central issue in this case: whether, and to what extent, State Farm must share with its insureds any expenses necessary to obtain a settlement from a tortfeasor.
*645 C. Expenses of Collecting the PIP Recoveries
Through the settlement of their claims, both Mahler and Fisher obtained funds that included State Farm's PIP payments.[11] Mahler and Fisher argue, however, State Farm is entitled to those funds only if it pays a pro rata share of the costs involved in settling their cases, including the cost of their attorney fees. State Farm adamantly refuses to pay those costs.
State Farm asserts: "The insurance policy between State Farm and the plaintiffs expressly provides that if the insured recovers State Farm's subrogation interest from the party at fault and State Farm shares in the recovery, State Farm will pay its share of the legal expenses. There is no additional requirement that the efforts of the insured's attorney be necessary to State Farm's recovery, or that they benefit State Farm." Br. of Appellant State Farm at 29. We agree.
State Farm then points to the last sentence of Paragraph d and asserts this sentence establishes an exception to its promise to pay. The intercompany arbitration agreement to which the policy refers binds signatory insurance companies (including State Farm, Farmers, and Federated; Br. of Amicus Arbitration Forums, Inc. at 1) "to arbitrate all disputes arising from the pursuit of subrogation, reparations, reimbursement, indemnity or direct action recovery rights created by the payment of claims or benefits to insureds." Mahler Clerk's Papers at 340.[12] Thus, State Farm argues, its PIP payments were "recoverable" from Farmers and Federated through an inter-company arbitration agreement: "Under the policy, State Farm is not required to pay its share of legal expenses, even if the insured recovered from the party at fault and State Farm shared in the recovery." Br. of Appellant State Farm at 32. "State Farm's subrogation interest was always `capable of being recovered' in the inter-company arbitration, regardless of whether or when the plaintiffs settled with the tortfeasor, and regardless whether it was actually recovered in the arbitration. The court may not read the word `recoverable' out of the contract." Id. at 33.[13]
To test whether State Farm is correct that the policy provision negates its promise to pay a share of the costs of recovering the PIP payments, we must determine what the word "recoverable" means in the context of State Farm's policy. The word appears in this sentence: "This does not apply to any amounts recovered or recoverable by us from any other insurer under any inter-insurer arbitration agreement." The indefinite pronoun "this" apparently refers to State Farm's promise to pay its share of legal expenses involved in recovery of PIP payments from the tortfeasor. Thus, the *646 third sentence of Paragraph d obviates State Farm's promise to pay when its PIP payments are recoverable from "any other insurer under any inter-insurer arbitration agreement." (Emphasis added.)
This language plainly has nothing to do with traditional subrogation rights as described in the second paragraph of Paragraph b and Paragraph c of State Farm's policy. State Farm's insureds, as plaintiffs, have claims against their tortfeasors, but not against their tortfeasors' insurance carriers. Thus, if State Farm were to subrogate to its insured's rights, standing in the shoes of its insureds, State Farm would also have no claim against the tortfeasors' insurance carriers stemming from the occurrence that gave rise to the PIP payments. Because the inter-insurer agreement "shall not be construed to create any causes of action or liabilities not existing in law or equity," Mahler Clerk's Papers at 109 (Personal Injury Protection (No-Fault) Arbitration Agreement Rules and Regulations at 1), we are at a loss to understand what State Farm believes is "recoverable" against the tortfeasors' insurers.
We next examine whether, under the circumstances of the cases at bar and the policy language, there is anything to recover, assuming arguendo State Farm does have a claim against the tortfeasors' insurers that makes its PIP payments "recoverable." As noted above, State Farm contracted for a right to reimbursement from its insureds' settlement proceeds and a traditional right of subrogation only if its insured did not seek recovery from a tortfeasor. As Fisher and Mahler sought such recovery, State Farm had only a right of reimbursement from its insureds from the proceeds of the settlements. More important, State Farm had to await the outcome of the settlement process before attempting any recovery from the tortfeasors' insurers, because, pursuant to Thiringer, State Farm was not entitled to any recovery of its PIP payments until its insureds had been made whole. Until the settlement agreements became effective, however, there was no way to know if Mahler and Fisher had been made whole. Thus, State Farm could do nothing until the settlements were executed.
Once the settlements were executed, however, there was nothing left for State Farm to recover, either from the tortfeasors or the tortfeasors' insurance companies. Surely the tortfeasors cannot be made to pay Mahler and Fisher once, and then pay State Farm again.[14] Nor can we discern any rule of law or of commercial common sense that would permit State Farm to recover from the tortfeasors' insurers after those insurers had already paid their insureds to settle with Mahler and Fisher.
In summary, State Farm had no rights against the tortfeasors' insurers, and even if it did, nothing was "recoverable."[15] That being the case, the exception stated in Paragraph d does not apply. We hold State Farm must pay Mahler and Fisher according to the first sentence of Paragraph d if it wishes to obtain recovery for its PIP payments.[16]
*647 Strangely, State Farm argues this rule at Paragraph d in its own insurance contract contravenes public policy for four reasons: (1) plaintiff's counsel already is receiving a contingent fee for the work she is doing for her client, State Farm should not have to pay for those same services; (2) there was no consensual attorney/client relationship between State Farm and plaintiffs' attorneys in these cases; (3) plaintiffs' attorneys' dual representation of insurer and insured would create a potential conflict of interest; and (4) it is unethical for an attorney to calculate a contingent fee based on PIP payments the client received without any effort by the attorney. The only authority State Farm offers to support these arguments is Judge Forrest's concurring opinion in the Desmond case. Desmond v. Liberty Northwest Ins. Corp., 63 Wash.App. 81, 89-91, 817 P.2d 872 (1991) (Forrest, J., concurring).
Although we consider it odd for State Farm to be contending its own contract language is bad public policy,[17] we nevertheless respond. State Farm's arguments are not persuasive. First, a plaintiff in a personal injury action is entitled to seek recovery from the tortfeasor for special damages, such as medical payments and lost wages. Indeed, it would be unrealistic and unfair to expect an injured party not to seek such damages. As State Farm frankly and correctly admits:
[I]t is a well known fact that the dollar amount of medical expenses has a direct influence on the amount of general damages that will be awarded by a court or jury and it is for that reason that attorneys desire to prove the amount of such expenses. The amount of lost earnings also has an important impact as it tends to demonstrate the period of physical disability.
Br. of Resp't State Farm at 15. The approach State Farm argues for here would require injured plaintiffs to refrain from seeking recovery from defendants for PIP benefit payments simply because State Farm might elect to recover those payments on its own. The result would be reduced general damage awards by juries. Injured plaintiffs should be able to introduce all relevant evidence to support their general damages claim. Sofie v. Fibreboard Corp., 112 Wash.2d 636, 646, 771 P.2d 711, 780 P.2d 260 (1989) (jury's role in determining noneconomic damages is perhaps even more essential than its role in determining economic damages).
Moreover, that counsel for the insured, in the course of pursuing a recovery for the insured, also obtains recovery of the insurer's PIP payments, does not militate against a sharing of expenses. This equitable sharing rule is based on the common fund doctrine, which, as an exception to the American Rule on fees in civil cases, applies to cases where litigants preserve or create a common fund for the benefit of others as well as themselves. Covell v. City of Seattle, 127 Wash.2d 874, 891, 905 P.2d 324 (1995). The Court of Appeals in Pena v. Thorington, 23 Wash.App. 277, 282, 595 P.2d 61 (1979), in denying attorney fees, referred to the motivation of the plaintiff's attorney in securing *648 adequate recovery for the client, rather than obtaining recovery for the PIP insurer. Motivation of counsel is irrelevant in this context; the proper focus is the benefit received.
State Farm's second policy argument is that it had no consensual attorney/client relationship with Mahler and Fisher's attorneys. That argument simply makes no difference in common fund cases. Consent to counsel by the benefited party is not required in common fund cases. If consent were required, there would be no common fund rule at all. Thus, if State Farm wishes to receive the benefit of the funds Mahler and Fisher recovered, it must share the expenses of recovering those funds. No attorney/client relationship is necessary, so long as the efforts of the attorney were a benefit to the common fund. Again, the proper focus is on the benefit to State Farm.
With regard to its third argument, potential conflict of interest, State Farm says: "[T]he attorney may be placed in the position of negotiating with the insurance carrier to reduce the amount of its subrogation recovery to maximize the recovery for the insured." This argument is difficult to follow. It appears to be based on Judge Forrest's erroneous conclusion that the plaintiff/insured's attorney is simultaneously the attorney for State Farm. Desmond, 63 Wash. App. at 90, 817 P.2d 872. As noted above, in common fund cases, there is no necessity for an attorney/client relationship between the attorney whose work creates the common fund and any benefited party. The attorney for the insured is supposed to do whatever is necessary to maximize recovery for the client. The PIP carrier knows what it paid in benefits, and may either be subrogated for that amount or contract with its insureds for reimbursementno more, no less.[18] It makes no difference how State Farm's insureds may choose to segregate and label their recovery from the tortfeasor into general damages and special damages (something a typical plaintiff has no interest in doing anyway)the amount State Farm is entitled to by means of subrogation is based solely on what benefits it paid out.
In any event, there is no question in this case that the insureds were both fully compensated by the settlements, or that State Farm was not prejudiced by those settlements.
As a final matter, State Farm argues Mahler and Fisher's attorneys should not be permitted to receive contingent fees for PIP amounts State Farm paid by contract before the attorneys were even involved in the respective cases: "Plaintiffs' lawyer did not recover the medical expenses paid by State Farm by settlement or judgment. His fee agreement does not entitle him to a contingent fee based on such amounts." Br. of Appellant State Farm at 39-43. This argument is without merit.
Mahler and Fisher's attorneys did recover from the tortfeasors money in excess of the PIP amounts State Farm paid, and State Farm's PIP payments were presumably included in those sums as special damages. The tortfeasors' insurers did not simply send checks by return mail when Mahler and Fisher's attorneys presented demand letters. In order to obtain settlements, both Mahler and Fisher had to persuade those insurers first that there was liability and second that they incurred significant damages provable at trial. Mahler and Fisher's attorneys were compensated pursuant to their fee agreements for that work.
The vociferous concern of State Farm and the amici insurers that the plaintiffs' bar will receive a second, unmerited attorney fee is also misplaced. To the extent counsel for the insured pursues a recovery for the insured, counsel is entitled to a single fee from the insured for the work performed. In Mahler, for example, counsel received a contingent fee from the overall recovery and placed an amount representing State Farm's PIP payments into Mahler's trust account. Counsel has already been fully compensated pursuant to the fee agreement. The money in trust, the settlement proceeds, belongs entirely to Mahler. State Farm, pursuant to Paragraph b, has chose in *649 action against that money, less Mahler's reasonable expenses in recovering it, as reimbursement for its PIP payments pursuant to Paragraph b. It is of no concern to State Farm whether any fee agreement between Mahler and her attorney provides for additional attorney fees. State Farm has no standing to complain about fee agreements it is not a party to. This is as it should be. The effort to secure a personal injury recovery, which involves both the insurer's PIP payments and the insured's other damages, must inure to the benefit of the insured, not the insured's lawyers.[19]
D. Prejudgment Interest in Mahler
In Mahler, the trial court awarded prejudgment interest to Mahler on the funds that were retained by Mahler's counsel in his trust account pending resolution of the sharing of expenses issue.
Prejudgment interest is allowed in civil litigation at the statutory judgment interest rate, RCW 4.56.110, RCW 19.52.020, when a party to the litigation retains funds rightfully belonging to another and the amount of the funds at issue is liquidated, that is, the amount at issue can be calculated with precision and without reliance on opinion or discretion. Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 33, 442 P.2d 621 (1968).
The award of prejudgment interest here fails. The touchstone for an award of prejudgment interest is that a party must have the "use value" of the money improperly. Hansen v. Rothaus, 107 Wash.2d 468, 473, 730 P.2d 662 (1986). In effect, an award of prejudgment interest compels a party that wrongfully holds money to disgorge the benefit. In the present case, State Farm did not possess the money as it was in the trust account of Mahler's counsel. The money in that account was entirely Mahler's, and she could have invested it any way she chose, rather than leaving it in trust. Because she had full control of it, she did not lose any "use value." Consequently, the award of prejudgment interest here is vacated.
E. Attorney Fees in Mahler
The trial court in Mahler entered an award of attorney fees in differing amounts for the work of Mahler's attorneys in securing recovery. The court allowed fees and costs pursuant to Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991), in the amount of $56,354.59. In the alternative, the court allowed fees and costs pursuant to MAR 7.3 in the amount of $32,694.59. In neither instance did the trial court enter findings of fact or conclusions of law to explain its analysis in entering the fee awards. We must determine if Mahler's counsel is entitled to reasonable attorney fees at trial and on appeal, and the amount of such fees.
1. Entitlement of an Award of Fees
The trial court awarded attorney fees to Mahler based on Olympic S.S. In that case, we held "[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorneys fees, regardless of whether the duty to defend is at issue." Olympic S.S., 117 Wash.2d at 54, 811 P.2d 673. See also McGreevy v. Oregon Mut. Ins. Co., 128 Wash.2d 26, 28, 904 P.2d 731 (1995) (reaffirming Olympic S.S.).
State Farm asserts the issue of whether it was required to pay a proportionate share of its insured litigation expenses to recover its subrogation interest is not a coverage issue susceptible to an award of attorney's fees, citing Dayton v. Farmers Ins. Group, 124 Wash.2d 277, 876 P.2d 896 (1994) (fees not recoverable for dispute over amount of recovery). Mahler responds by noting State Farm refused to pay its share of the litigation expenses, and she had to litigate to obtain a judgment requiring State Farm to pay.
We believe this case is largely resolved by our discussion of fees in Leingang v. Pierce County Med. Bureau, Inc., 131 Wash.2d 133, 930 P.2d 288 (1997). In Leingang, a health care contractor had a policy provision excluding coverage if the insured had automobile *650 liability coverage providing uninsured/underinsured motorist (UIM) coverage. The contract also had a subrogation clause. The plaintiff was injured in an automobile accident and the defendant paid PIP benefits to the plaintiff, but insisted upon a right to recover PIP benefits paid from any recovery the plaintiffs obtained. The defendant so advised the tortfeasor's insurance carrier as well as the plaintiff's UIM carrier. The UIM carrier paid its policy limits into the registry of the court pending the disposition of the dispute between the contractor and the plaintiff. Ultimately, the plaintiff prevailed in his declaratory judgment action against the contractor and we allowed him to recover fees. We determined coverage, not the extent of damages, was the essential gravamen of the dispute:
In the present case, PCM argued throughout the case that Mr. Leingang did not have coverage for any medical bills which his own UIM carrier would ultimately pay. The entire case concerned the validity of an exclusion from coverage.

Leingang, 131 Wash.2d at 144-45, 930 P.2d 288 (second emphasis added). We then stated:
The real dispute in this case went to the issue of coverage. If the exclusion was enforceable, then there was no coverage under the medical policy and the insurer was entitled to be repaid the bills it paid to the extent that UIM benefits were available. The dispute had nothing to do with the degree of Mr. Leingang's injuries or the necessity for or amount of the bills; it only had to do with whether the medical insurance contract covered the bills. Although PCM paid Mr. Leingang's bills, it then forced him to litigate the issue of coverage by asserting an interest against the proceeds of his UIM policy proceeds. We therefore conclude that the trial court properly awarded attorney fees for the part of the suit which determined the issue of coverage.
Leingang, 131 Wash.2d at 147-48, 930 P.2d 288.
In this case, the dispute between Mahler and State Farm is not a coverage dispute, but rather a dispute over the value of State Farm's subrogation interest. Both Mahler and State Farm agree State Farm has a right to be reimbursed for PIP benefits paid to Mahler. The dispute between them boils down to the value of that right of reimbursement. Insofar as the principal focus of this dispute is the value of State Farm's subrogation interest, Dayton controls rather than Olympic S.S./McGreevy. Mahler is not entitled to fees under this theory.
Independent of any theory for recovery of fees set forth in Olympic S.S. and its progeny is the right of Mahler to recover fees under MAR 7.3, which provides:
The court shall assess costs and reasonable attorney fees against a party who appeals the award and fails to improve the party's position on the trial de novo. The court may assess costs and reasonable attorney fees against a party who voluntarily withdraws a request for a trial de novo. "Costs" means those costs provided for by statute or court rule. Only those costs and reasonable attorney fees incurred after a request for a trial de novo is filed may be assessed under this rule.
In light of our disposition of the principal issue in this case, we hold Mahler is entitled to an award of reasonable attorney fees under MAR 7.3 as State Farm appealed the arbitrator's award to superior court and failed to improve on its position there. Mahler is also entitled to her reasonable attorney fees on appeal, Christie-Lambert Van & Storage Co. v. McLeod, 39 Wash.App. 298, 309, 693 P.2d 161 (1984); Arment v. Kmart Corp., 79 Wash.App. 694, 700, 902 P.2d 1254 (1995), but, in light of our disposition of the amount of the fee award, infra, the superior court will set the award of appellate fees on remand. RAP 18.1(i).
2. Amount of Fees
Mahler asks us to sustain the trial court's fee award. State Farm contends the fee award below was unreasonable in light of the small amount at stake in this case.
At the outset, we note that the amount of the recovery, while a relevant consideration in determining the reasonableness of the fee award, is not a conclusive *651 factor. Beeson v. Atlantic-Richfield Co., 88 Wash.2d 499, 563 P.2d 822 (1977); Scott Fetzer Co. v. Weeks, 122 Wash.2d 141, 150, 859 P.2d 1210 (1993). We will not overturn a large attorney fee award in civil litigation merely because the amount at stake in the case is small.
Instead, courts should be guided in calculating fee awards by the lodestar method in determining an award of attorney fees as costs. Scott Fetzer Co. v. Weeks, 114 Wash.2d 109, 786 P.2d 265 (1990).[20] The lodestar methodology affords trial courts a clear and simple formula for deciding the reasonableness of attorney fees in civil cases and gives appellate courts a clear record upon which to decide if a fee decision was appropriately made. Under this methodology, the party seeking fees bears the burden of proving the reasonableness of the fees. Fetzer, 122 Wash.2d at 151, 859 P.2d 1210.
Under the lodestar methodology, a court must first determine that counsel expended a reasonable number of hours in securing a successful recovery for the client. Necessarily, this decision requires the court to exclude from the requested hours any wasteful or duplicative hours and any hours pertaining to unsuccessful theories or claims. Fetzer, 122 Wash.2d at 151, 859 P.2d 1210. Counsel must provide contemporaneous records documenting the hours worked. As we said in Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 597, 675 P.2d 193 (1983), such documentation
need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed, and the category of attorney who performed the work (i.e., senior partner, associate, etc.).
The court must also determine the reasonableness of the hourly rate of counsel at the time the lawyer actually billed the client for the services. Fisher Properties, Inc. v. Arden-Mayfair, Inc., 115 Wash.2d 364, 798 P.2d 799 (1990) (outside civil rights context, contemporaneous rates actually billed rather than current rates or contemporaneous rates adjusted for inflation will be employed).
Finally, the lodestar fee, calculated by multiplying the reasonable hourly rate by the reasonable number of hours incurred in obtaining the successful result, may, in rare instances, be adjusted upward or downward in the trial court's discretion. Fetzer, 122 Wash.2d at 150, 859 P.2d 1210; Travis v. Washington Horse Breeders Ass'n, 111 Wash.2d 396, 759 P.2d 418 (1988).
In the past, we have expressed more than modest concern regarding the need of litigants and courts to rigorously adhere to the lodestar methodology. See Scott Fetzer Co., 122 Wash.2d 141, 859 P.2d 1210. Courts must take an active role in assessing the reasonableness of fee awards, rather than treating cost decisions as a litigation afterthought. Courts should not simply accept unquestioningly fee affidavits from counsel. Nordstrom, Inc. v. Tampourlos, 107 Wash.2d 735, 744, 733 P.2d 208 (1987).
Consistent with such an admonition is the need for an adequate record on fee award decisions. Washington courts have *652 repeatedly held that the absence of an adequate record upon which to review a fee award will result in a remand of the award to the trial court to develop such a record. Smith v. Dalton, 58 Wash.App. 876, 795 P.2d 706 (1990); Rhinehart v. Seattle Times, 59 Wash.App. 332, 798 P.2d 1155 (1990); Bentzen v. Demmons, 68 Wash.App. 339, 842 P.2d 1015 (1993); State Farm Mut. Auto. Ins. Co. v. Johnson, 72 Wash.App. 580, 871 P.2d 1066, review denied, 124 Wash.2d 1018, 881 P.2d 254 (1994). Not only do we reaffirm the rule regarding an adequate record on review to support a fee award, we hold findings of fact and conclusions of law are required to establish such a record.
This case exemplifies the rationale for such a rule. The record discloses affidavits from four different counsel or firms who represented Mahler. We cannot discern from the record if the trial court thought the services of four different sets of attorneys were reasonable or essential to the successful outcome. We do not know if the trial court considered if there were any duplicative or unnecessary services. We do not know if the hourly rates were reasonable. We note the trial court found two different amounts reasonable, depending upon whether MAR 7.3 or Olympic S.S. was the basis for fees.
Fee decisions are entrusted to the discretion of the trial court, Boeing Co. v. Sierracin Corp., 108 Wash.2d 38, 65, 738 P.2d 665 (1987), but we will exercise our supervisory role to ensure that discretion is exercised on articulable grounds. We remand the fee award to the trial court for the entry of proper findings of fact and conclusions of law consistent with this opinion.

CONCLUSION
Subrogation in the insurance context of personal injury claims presents numerous problems. Subrogation serves an important and traditional role in the property loss arena. But in the personal injury context, however, subrogation principles are not readily applicable when an insured seeks noneconomic damages from a tortfeasor. The Legislature may wish to address these questions.
In general, an insurer may be reimbursed for PIP payments made to an insured. Provided the insurer recognizes the public policy in Washington of full compensation of insureds and its other duties to insureds by statute, regulation, or common law, the insurer may establish its right to reimbursement and the mechanism for its enforcement by its contract with the insured.
Under the specific language of the State Farm policy on sharing of expenses, State Farm must share in the expense its insureds incurred to recover State Farm's PIP payments from the tortfeasors in the respective cases.
In Mahler, we affirm the judgment of the trial court as to the sharing of expenses, but vacate the award of prejudgment interest and remand the case to the trial court for the entry of findings of fact and conclusions of law on attorney fees per MAR 7.3. In Fisher, we reverse the judgment of the trial court, and remand the case with instructions to enter judgment in favor of Fisher, consistent with our opinion.
DOLLIVER, SMITH, GUY and JOHNSON, JJ., concur.
MADSEN, Justice, concurring.
Although I agree with the majority, I do not agree with its explanation as to why the exception to cost-sharing in paragraph d retains validity. The exception appears in the insurance contract in the third sentence of paragraph d, under the heading "`Our Right to Recover our Payments,'" and provides that State Farm will not pay its share of legal expenses for any amounts recovered or recoverable by State Farm from any other insurer under an inter-insurer arbitration agreement. Majority at 643-644. The majority reasons that this language retains meaning in cases like Leader Nat'l Ins. Co. v. Torres, 113 Wash.2d 366, 779 P.2d 722 (1989), and in cases where an insurer seeks to recover on its own. Majority at 646 n. 15.
I disagree. In Leader, the insurance company's right to subrogation concerned $10,000 it had paid in personal injury protection (PIP) benefits. The insured's settlement involved claims for medical costs, lost wages *653 and general damages; however, the insured refused to seek recovery for the $10,000 which its insurance company had paid in PIP benefits. The court held in Leader that the insurance company was not foreclosed by a release signed by the tortfeasor and its insured from pursuing a subrogation right to recover the PIP payments where the tortfeasor and the insured both knew the insurance company did not agree to the settlement, and the tortfeasor had additional assets. Under such facts, the insurance company would expend its own resources to recover the amount of PIP insurance paid from the tortfeasor. No issue of cost-sharing arises at all because the insured did not recover the amount representing the PIP payments and did not incur costs for doing so. The same is true where the insurer otherwise chooses to seek recovery on its own because the insured declines to pursue a recovery.
I am satisfied, nevertheless, with the majority's analysis in general even if the result is that the exception concerning amounts recovered or recoverable under an inter-insurer arbitration agreement has little or no application.[1] This is because if the exception is given effect as State Farm urges it should be, an insurer could avoid its promise to share costs simply by virtue of the inter-company arbitration agreement. For example, under the facts in Mahler's case, State Farm proceeded under the inter-company arbitration agreement only after the insured settled with the tortfeasor. The arbitration panel's decision that American States (the tortfeasor's insurance company) was liable for the $4,173.32 of PIP coverage State Farm had paid did not result in an additional payment of that amount, but instead effectively determined that of the settlement amount already received by Mahler, $4,173.32 represented the amount of liability from American States. As the majority notes, however, Mahler's attorney had already placed the amount representing PIP benefits paid by State Farm in his trust account, informing Mahler that this amount would be reserved until the "`amount of subrogation is resolved.'" Majority at 637 (quoting Mahler Clerk's Papers at 431.) While Mahler and State Farm disputed whether State Farm should be reimbursed the entire $4,173.32 or a net amount after cost sharing, there was no dispute that State Farm was entitled to recover from the settlement proceeds the amount of PIP benefits it had paid. In these circumstances, the determination that American States was liable to State Farm for the amount of PIP benefits paid, would, if viewed as a determination of an amount recovered or recoverable under the agreement, allow State Farm to obtain the full $4,173.32 without incurring costs of recovery. Resort to the inter-insurer arbitration agreement simply allows the insurer to avoid its promise to share costs.
I agree with the majority's analysis that State Farm cannot recover directly from the tortfeasor's insurance company nor can it recover its PIP payments until after the insured is fully compensated. Full compensation cannot be determined until after the settlement has been reached. Thus, as the Court of Appeals opined, the inter-company arbitration agreement acts merely as a "rubber stamp of personal injury litigation," not as the vehicle for recovery. Fisher v. Aldi Tire, Inc., 78 Wash.App. 902, 909, 902 P.2d 166 (1995).
With these clarifications, I concur in the majority's analysis and decision.
ALEXANDER, Justice, dissenting.
In my view, State Farm Mutual Automobile Insurance Company should not have to pay a pro rata share of the legal expenses for the recovery of Personal Injury Protection payments in either of these two cases because the payments in both were recoverable through inter-insurer arbitration. Because the majority concludes that these payments were not recoverable through inter-insurer arbitration, I dissent.
At issue in both cases is paragraph d of the State Farm insurance policy, which provides:
If the insured recovers from the party at fault and we share in the recovery, we will pay our share of the legal expenses. Our *654 share is that percent of the legal expenses that the amount we recover bears to the total recovery. This does not apply to any amounts recovered or recoverable by us from any other insurer under any inter-insurer arbitration agreement.
Mahler Clerk's Papers at 281.
The majority does not dispute that State Farm is bound by an inter-insurer arbitration agreement. The majority correctly interprets this fact to mean that State Farm does not have to pay legal expenses for its share of PIP payments when those payments were recoverable from "`any other insurer under any inter-insurer arbitration agreement.'" Majority op. at 646.
It goes on to conclude, however, that the provision exempting State Farm from paying a share of expenses does not apply here because State Farm could not recover payments from the tortfeasors' insurers. This is so, according to the majority, because the injured insureds could not recover from the tortfeasors' insurers. Therefore, because State Farm can only stand in the shoes of its injured insureds, it would also be precluded from recovering PIP payments from the tortfeasors' insurer.
The majority decision suffers from a fatal flaw. Its logic is undermined by the majority's concession that the injured insureds actually recovered their payments from the tortfeasors' insurers. "The tortfeasors' insurers did not simply send checks by return mail when Mahler and Fisher's attorneys presented demand letters. In order to obtain settlements, both Mahler and Fisher had to persuade those insurers first that there was liability and second that they incurred significant damages provable at trial." Majority op. at 648-649. Because the injured insureds recovered from the tortfeasors' insurers, and State Farm can stand in the shoes of its insureds, State Farm could have recovered the payments from the tortfeasors' insurers through inter-insurer arbitration. Therefore, because the payments were recoverable from the tortfeasors' insurers, State Farm should not have to pay its share of the legal expenses.
The majority acknowledges an invitation from the appellants and amicus in this case to find that "the equitable rule of pro rata sharing by the insured and the insurer of expenses necessary to secure a recovery against a tortfeasor constitute the public policy of Washington which may not be varied by contract." Majority op. at 646 n. 16. The majority purports to not reach this issue in light of its interpretation of paragraph d of the State Farm insurance policy; however, the fact that the majority details this public policy argument at some length, without also sharing countervailing arguments, implies its approval of the equitable rule advanced by appellants and amicus and creates reasonable cause for concern that its strained reading of paragraph d of the insurance policy is but an acceptance of the invitation to enact new public policy after all. Yet it is not this court's prerogative to simply read language out of a contract that it finds to be inequitable.
A contract of insurance ... should be given a practical and reasonable rather than a literal interpretation; it should not be given a strained or forced construction which would lead to an extension or restriction of the policy beyond what is fairly within its terms, or which would lead to an absurd conclusion, or render the policy nonsensical or ineffective.

Morgan v. Prudential Ins. Co., 86 Wash.2d 432, 434-35, 545 P.2d 1193 (1976) (citing Philadelphia Fire & Marine Ins. Co. v. City of Grandview, 42 Wash.2d 357, 255 P.2d 540 (1953); 44 C.J.S. Insurance § 296 (1945)).
Finally, in light of the foregoing, I would also go a step further than the majority does in reversing the trial court in Mahler for its award of $51,779.93 in attorney fees (for work in obtaining legal expenses amounting to $1,612.59) to Mahler under Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991). Correctly finding Olympic Steamship inapposite under the circumstances of the case, the majority would instead remand to have the superior court award Mahler attorney fees under MAR 7.3. The rationale for this award is that State Farm appealed an arbitrator's award to the superior court and failed to improve its position there. Although I welcome the majority's constructive discussion *655 of the criteria for determining the reasonableness of attorney fees because I find that the superior court erred in awarding legal expenses to Mahler, it necessarily follows that there should be no award of attorney fees under MAR 7.3 to Mahler for her litigation to pursue those expenses.[1]
NOTES
[1] Because Mahler's attorney had already deducted his one-third contingent fee of the gross amount of the settlement ($8,083.33), the money he placed in his trust account was all Mahler's.
[2] The trial court followed the formula in Mahler's insurance policy. It first found the proportion the amount of State Farm's PIP payments bore to the total recovery: $4,173.32 ÷ $24,500 = 16.91%. It then calculated 16.91 percent of the total legal expenses, $9,370.31 (consisting of $8,083.33 for legal fees and $1,286.98 for costs), to reach the offset amount of $1,612.59. As a result of this calculation, State Farm is required to pay Mahler $1,612.59 as expenses for recovering State Farm's $4,173.12 in PIP payments, or approximately 39 percent of the amount it recovers. This might represent a slight advantage to Mahler, as she had to pay her attorney only 33 percent of the recovery for his services. As can be seen from State Farm's formula, however, the larger the settlement amount compared to the PIP payments, the smaller the percentage of expenses State Farm must share.
[3] Fisher's attorney averred in an affidavit, "State Farm contacted me only after liability had been established and after all the necessary and essential work to recover the subrogation interest and other damages from the defendant occurred." Fisher Clerk's Papers at 272. State Farm does not dispute the assertion.
[4] We are not persuaded that one rationale for subrogation in the insurance context is "to prevent unjust enrichment of the insured," as the Court of Appeals said below. Fisher, 78 Wash. App. at 906, 902 P.2d 166. The notion is the insured would be unjustly enriched if he or she received PIP payments from an insurer and subsequently recovered special damages from the tortfeasor duplicating the PIP payments. First, the asserted rationale does not appear in classical discussions of the purposes of subrogation. See, e.g., Aetna Life Ins. Co. v. Town of Middleport, 124 U.S. 534, 8 S.Ct. 625, 31 L.Ed. 537 (1888). Second, Washington public policy is altogether to the contrary. "It is a well settled rule in tort actions that a party has a cause of action notwithstanding the payment of his loss by an insurance company." Consolidated Freightways v. Moore, 38 Wash.2d 427, 430, 229 P.2d 882 (1951); Ciminski v. SCI Corp., 90 Wash.2d 802, 585 P.2d 1182 (1978). The Legislature has abolished the collateral source rule in the specific case of injuries occurring as a result of health care, but not in other contexts. RCW 7.70.080. We reject the notion that subrogation principles trump the collateral source rule.
[5] See discussion in Honey v. Davis, 131 Wash.2d 212, 222-25, 930 P.2d 908, 937 P.2d 1052 (1997) (Talmadge, J., concurring).
[6] For instance, "until 1958 the subrogation clauses that were included in the standard forms for automobile insurance specifically were not applicable to medical payments coverages." ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW 228 (1988). "Automobile medical payments coverage is of comparatively recent origin. It was conceived and reared without benefit of subrogation, and only during the past few years have some automobile insurers undertaken to wrap it in a mantle of subrogation." Travelers Indem. Co. v. Chumbley, 394 S.W.2d 418, 425, 19 A.L.R.3d 1043 (Mo.App.1965).
[7] We are dubious that two actions arising from the same tort against a tortfeasor may proceed either simultaneously or consecutively, one by the injured insured seeking noneconomic damages, and another by the injured insured's PIP carrier seeking recovery of its PIP payments. Elementary considerations of the undesirability of claim splitting and of fairness to the defendant tortfeasor militate against such an outcome. "The doctrine of claim preclusion prohibits claim splitting as a matter of policy, primarily in order to conserve judicial resources and to ensure repose for parties who have already responded adequately to the plaintiff's claims." Babcock v. State, 112 Wash.2d 83, 93, 768 P.2d 481 (1989).
[8] "Usually, subrogation allows an insurer to recover what it pays to an insured under a policy by suing the wrongdoer. The insurer steps `into the shoes' of its insured." Touchet Valley Grain Growers, Inc. v. Opp & Seibold General Constr., Inc., 119 Wash.2d 334, 341, 831 P.2d 724 (1992).
[9] The term "reimbursement" comes into play where an insurer is permitted to recoup its payment out of the proceeds of an insured's recovery from the tortfeasor. In this situation the insurer's right of recoupment is contingent upon a third-party recovery by the insured.

1 IRVIN E. SCHERMER, AUTOMOBILE LIABILITY INSURANCE 3D § 19.01, at 19-2 (1995).
[10] State Farm does not argue equitable subrogation applies in these cases. If equitable subrogation did apply, we would be compelled to consider under equitable principles the sharing of legal fees incurred in obtaining recoveries from the tortfeasors.
[11] In these cases, Mahler and Fisher both collected settlement amounts in excess of State Farm's PIP payments. Neither Mahler nor Fisher argue they would not be fully compensated were they to reimburse State Farm from the settlement proceeds. State Farm contractually obligated itself to subordinate its reimbursement rights to the attainment of full compensation by its insureds. See last sentence of policy language quoted supra. This policy language reflects our rule requiring full compensation to insureds before an insurer becomes entitled to reimbursement for a loss. Thiringer v. American Motors Ins. Co., 91 Wash.2d 215, 588 P.2d 191 (1978). See also Brown v. Snohomish County Physicians Corp., 120 Wash.2d 747, 845 P.2d 334 (1993).
[12] The intercompany arbitration agreement is not new. Insurance companies recognized many years ago the disadvantages in costs, delay, and public relations stemming from litigation of subrogation actions among insurers. The use of arbitration to resolve such disputes occurred first in New York in 1929. A Nationwide Inter-Company Arbitration Agreement was drafted and became effective on February 1, 1952. HORN, supra, at 127-28. Approximately 2,000 insurance companies are signatories to the current version of the agreement. Br. of Amicus Arbitration Forums, Inc. at 1.
[13] Amici insurance carriers contend the sharing of expenses will significantly increase the cost of PIP coverage and suggest the plaintiffs' trial bar should not be allowed to recover an additional fee. Amicus Arbitration Forums, Inc., notes that 2,000 insurance companies and self-insurers are signatories to inter-company arbitration and argues its arbitration process is a true independent alternative dispute resolution process (not a rubber stamp) favored under Washington's public policy favoring arbitration of disputes. The economics of the insurance industry are not before the Court, and nothing in the appellate record supports their argument as to the effect of third party recoveries on insurance rates.
[14] By settling with Mahler and Fisher, the tortfeasors did not destroy State Farm's subrogation rights. State Farm's insurance contract, under the circumstances of these cases, afforded State Farm only a right to reimbursement from its insureds. State Farm had no conventional subrogation rights with respect to the PIP benefits here.
[15] Our disposition of this issue recognizes that inter-company arbitration may serve a valid purpose where the insured's settlement with a tortfeasor falls within the ambit of Leader Nat'l or an insured declines to pursue recovery from a tortfeasor and the insurer chooses to seek a recovery on its own. Neither situation is true here.
[16] Mahler, Fisher, and amicus WSTLA invite us to hold that the equitable rule of pro rata sharing by the insured and the insurer of expenses necessary to secure a recovery against a tortfeasor constitute the public policy of Washington which may not be varied by contract. See Fisher, 78 Wash.App. at 908, 902 P.2d 166 (parties to insurance contract may deviate from common law subrogation principles).

Mahler, Fisher, and WSTLA find expression for this public policy argument in the public policy of full recovery articulated in Thiringer, the disparity of bargaining power between insurers and insureds, the fiduciary relationship of insurers to insureds, the policy of RCW 51.24.060 relating to liens for industrial insurance benefits paid, and the ability of insurers to obtain a pro rata sharing of expenses per WAC 284-30-390(4). In light of our interpretation of paragraph d of State Farm's policy, we do not reach this issue.
[17] The State Farm policy language on sharing of expenses comports with the equitable rule described in Pena v. Thorington, 23 Wash.App. 277, 281, 595 P.2d 61 (1979), and recognized by this Court in Metropolitan Life, 70 Wash.2d at 321, 422 P.2d 780. A leading insurance treatise stated:

It is grossly inequitable to expect an insured, or other claimant, in the process of protecting his own interest, to protect those of the [insurer] as well and still pay counsel for his labors out of his own pocket, or out of the proceeds of the remaining funds. And this is precisely the view taken by the overwhelming majority of decisions, in that a proportionate share of fees and expenses must be paid by the insurer or may be withheld from its share.
8A JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 4903.85, at 335 (1981). Mahler cites 24 states that have adopted this rule. Br. of Resp'ts at 11-12. In the event an insured receives PIP payments from State Farm and decides not to pursue a personal injury action against the tortfeasor (the situation provided for in the second paragraph of Paragraph b), and State Farm then subrogates and obtains a recovery in excess of its PIP payments, it will deduct its costs of obtaining the recovery before releasing the excess to its insured. In somewhat analogous circumstances, Washington public policy forbids one-way attorney fee provisions. RCW 4.84.330.
[18] A question not presented in this case is what State Farm's priority rights to recover its PIP payments would be if the settlement did not make its insured whole.
[19] This is distinct from the situation where the insurer chooses to retain the services of counsel for the insured to pursue a subrogated interest against a third party.
[20] This methodology can be supplemented by an analysis of the factors set forth in RPC 1.5(a) which guide members of the Bar as to the reasonableness of a fee. Allard v. First Interstate Bank of Wash., 112 Wash.2d 145, 768 P.2d 998, 773 P.2d 420 (1989). RPC 1.5(a) states:

A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, the skill requisite to perform the legal service properly and the terms of the fee agreement between the lawyer and client;
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved in the matter on which legal services are rendered and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) Whether the fee [is fixed or contingent].
[1] However, I add that circumstances in another case might reveal a viable application of the exception, and so stop short of concluding the exception can never be effective.
[1] The superior court had earlier allowed, without any explanation as to its analysis, an award of attorney fees under MAR 7.3 in the alternative to Olympic Steamship. The amount of these fees would have been $32,694.59 for work to obtain legal expenses in the amount of $1,612.59.