# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| THOMAS G. BOWDISH and CHARLENE P. BOWDISH LIVING TRUST, and THOMAS G. BOWDISH and CHARLENE P. BOWDISH, husband and wife, | No.  52227-6-II |
| Appellants, | |
| v. | |
| KAREN K. DECARUFEL, as Trustee of the R & J FAMILY TRUST and ROGER RICKER and JEANNETTE RICKER, husband and wife, | UNPUBLISHED OPINION |
| Respondents. | |

SUTTON, J. — This property dispute concerns three easements involving landowners who own adjoining lots in Seamount Estates.  The landowners are Thomas and Charlene Bowdish, who own lots 9, 10, and 11,[1] and Roger and Jeannette Ricker, who own lot 12.[2]  The Bowdishes appeal the superior court's conclusions of law related to the easements, the judgment quieting title to certain property, and the order awarding the Rickers' attorney fees based on the Bowdishes trespass onto the Rickers' property.

---

[1] The Bowdish Living Trust is named as an appellant along with Thomas and Charlene Bowdish. This opinion refers to the appellants collectively as the Bowdishes unless otherwise indicated.

[2] The R & J Family Trust and Karen Decarufel, as Trustee of the R & J Family Trust, are named as respondents along with Roger and Jeannette Ricker, as husband and wife.  This opinion refers to the respondents collectively as the Rickers unless otherwise indicated.

The Bowdishes argue that the superior court erred by (1) concluding that the Rickers had acquired title to the property west of the Bowdishes' fence erected on lot 11, (2) concluding that the Rickers established an easement for a gravel driveway across lot 11, connecting lot 12 to the main road in Seamount Estates, (3) concluding that an access easement existed over lots 5, 6, 7, 8, 9, 10, and 11, and terminated at lot 12,[3] (4) concluding that the Bowdishes did not have a ten-foot wide easement for utilities, five feet on either side of the common boundary line between lot 11 and lot 12, (5) awarding attorney fees to the Rickers under RCW 4.24.630(1), and (6) concluding that the Rickers did not trespass upon Bowdishes' property and, therefore, denying the Bowdishes' claim for an award of treble damages and attorney fees under RCW 4.24.630(1). Both parties request an award of attorney fees on appeal.

We affirm the trial court's conclusions of law related to the judgment quieting title, the three easements at issue, the attorney fee award to the Rickers, and the denial of treble damages and attorney fees to the Bowdishes. We also grant the Rickers an award of reasonable attorney fees on appeal relating to their RCW 4.24.630(1) claim, and deny the Bowdishes' request for attorney fees on appeal relating to their RCW 4.24.630(1) claim.

FACTS

I. BACKGROUND

This case involves property lots within Seamount Estates. Seamount Estates was originally platted in 1977 and was replatted in 1979. The Bowdishes own lots 9, 10, and 11 within Seamount Estates. The Rickers own lot 12. The Bowdishes purchased lots 9 and 10 in 1976 and then

---

[3] The property owners of lots 5-8 were not parties.

purchased lot 11 from Gordon Pettit in 1988. The Rickers purchased lot 12 from Leta Pettit, Gordon Pettit's widow, in 2003. Lot 11 and lot 12 are adjacent lots. Lot 11 lies to the east of lot 12.

When the Rickers purchased lot 12, the sole means of access to the property was a gravel driveway from Cirque Drive, the main road in Seamount Estates, which traverses a small portion of lot 11. The prior owners of lot 12, the Pettits, used the gravel driveway as their sole means of accessing lot 12 from the inception of their ownership of lots 11 and 12.

The plat and the replat of Seamount Estates depict an access easement from Cirque Drive that begins at the southwest corner of lot 5, traverses lots 5, 6, 7, 8, 9, 10, and 11, and terminates in the northeast corner of lot 12. There is a road on this easement that all lot owners, except the Bowdishes, use to access their properties.

When Ricker purchased lot 12, there was an asphalt driveway at the northeast corner of the lot in the precise location of the access easement depicted in the plat and the replat. This easement is also referenced in the Protective Covenants of Seamount Estates. Paragraph 16 of the Protective Covenants provides that "[t]he lot owners or contract purchasers of lots 5 through 12 are responsible for the upkeep of the access road servicing their lots." Exhibit 24.

The Protective Covenants also reference a ten-foot utilities easement, five feet on either side of the common boundary line of each lot in Seamount Estates. The Protective Covenants, dated January 20, 1977, were initially recorded on September 6, 1997. The Quit Claim Deed from the developers to Seamount Estates Community Club was dated April 8, 1977, and recorded on May 24, 1977. The Protective Covenants were subsequently re-recorded by Seamount Estates on March 18, 1994.

In 2001, Mr. Bowdish built a four-panel fence that started at a survey stake near the northeast corner of the Rickers' property and continued along the eastern side of lot 11. Mr. Bowdish told Mr. Ricker that the fence was the boundary line between lots 11 and 12. Mr. Bowdish showed Mr. Ricker a survey stake that Mr. Bowdish claimed marked the northeast corner of the Rickers' property. Mr. Ricker accepted Mr. Bowdish's representations.

The fence Mr. Bowdish erected blocked the asphalt driveway that could have provided access to the northeast corner of lot 12 from the access easement. Mr. Bowdish told Mr. Ricker that the driveway was installed by the county in error. Mr. Ricker relied on Mr. Bowdish's explanation.

Based on Mr. Bowdish's representations regarding the boundary line between lots 11 and 12, the Rickers continued to use the gravel driveway to access lot 12 and maintained their property up to the fence. After Mr. Bowdish erected the fence on lot 11, the Bowdishes did not use, occupy, or maintain any portion of property west of the fence.

In 2007, the Rickers removed an existing mobile home on lot 12 and began building a new house. The new house was completed in 2010. Mr. Ricker sited the new house on the property based on the gravel driveway being the only access point to lot 12. During the building process, Mr. Ricker excavated up to the fence line on lot 11 and Mr. Bowdish did not object. While Mr. Ricker was excavating his property, he accidentally covered up a survey stake denoting the boundary line between lot 11 and lot 12. Mr. Ricker also built a patio lined by manor blocks which came within inches of the Bowdishes' fence on lot 11. The Bowdishes did not object to the location of the patio.

4

In 2014, the Bowdishes decided to clear cut lot 11. In preparation of the work, the Bowdishes hired Daniel Holman to survey lot 11. Holman's survey showed that the northeast corner of lot 12 was actually 42 inches west of the fence Mr. Bowdish put up in 2001. After the 2014 survey, the Bowdishes repeatedly came onto the Rickers' property and caused damage. The Bowdishes moved or removed manor blocks; spray painted the Rickers' patio area, fence, flower beds, and manor block walls; killed ground cover vegetation using Roundup; damaged the Rickers' split rail fence; and damaged the Rickers' street number sign.

In 2015, Holman conducted a second survey. The 2015 survey showed that a portion of the Rickers' patio and the manor block wall containing the patio were encroaching on lot 11. Mr. Bowdish removed the fence on lot 11 shortly after Holman completed the 2015 survey. After Mr. Bowdish removed the fence, he placed a large pile of rocks to continue blocking the Rickers' access to lot 12 at the northeast corner of the property.

In 2016, the Bowdishes filed a complaint to quiet title, for damages, and for injunctive relief. The Bowdishes claimed that (1) the Rickers trespassed and caused a nuisance, (2) the Rickers interfered with an easement, (3) the Rickers' acts constituted trespass warranting treble damages and attorney fees under RCW 4.24.630, (4) the Bowdishes were entitled to injunctive relief, and (5) the title to the easements at issue should be quieted in the Bowdishes' favor. The Rickers counterclaimed and contended that (1) they had acquired an ownership interest in the strip of land between lot 12 and the fence Mr. Bowdish constructed via adverse possession, (2) the Bowdishes, alternatively, were estopped from denying the Rickers their ownership interest, (3) the Rickers had acquired a prescriptive easement over and across lot 11 for their gravel driveway, and (4) the Bowdishes trespassed onto the Rickers' property and caused injury under RCW 4.24.630.

## II. TRIAL PROCEEDINGS

After a three day bench trial, the trial court concluded that (1) the Rickers had established and acquired title to the strip of property west of the Bowdishes' fence at issue between lot 11 and lot 12 and (2) the Rickers had established an easement from the gravel driveway on their lot 12 over a portion of the Bowdishes' lot 11 to connect to Cirque Drive.

The trial court entered the following findings of fact:

1. Plaintiff Bowdish bought Lots 9 and 10 on real estate contracts in 1976 from the Seamount Estate developers. Bowdish bought Lot 11 from Pettit in 1988. He purchased all three lots subject to the provisions of the plats and covenants.

2. The Plat and Replat of Seamount Estates depict an easement for access and utilities over and across Lots 5, 6, 7, 8, 9, 10[,] and 11 to provide access for those lots as well as Lot 12.

3. The Restrictive Covenants of Seamount Estates state that a 10-foot utility easement is "reserved" to the original owners/developers on the five-feet of each lot's boundary line. No such easement was granted or easement to Lot 11 or to any other lot within the development. Instead, [a] utility easement is reserved to the developers and subsequently to the homeowners' association.

4. Pettit continued to own Lot 12 after selling Lot 11 to Bowdish. Pettit had a mobile home on Lot 12 and just south of the mobile home he had a gravel driveway on his property which ran southeasterly over a portion of Lot 11 and connected with Cirque Drive. Pettit had used the driveway when he owned both Lot 11 and Lot 12 and continued to use the driveway after he sold Lot 11 to Bowdish.

5. In 2003, Pettit's widow sold Lot 12 to [] Ricker on a real estate contract. At the time, Ricker purchased his property, Bowdish pointed out to Ricker the corners of Lots 11 and 12, pointing out the northeast corner of Lot 12 and the southeast corner of Lot 11 marked by a corner marker.

6. Bowdish subsequently erected a fence where the stake was that Bowdish had pointed out to Ricker. The fence blocked the paved apron which ran up to Lot 12. Bowdish told Ricker there was no easement over that area. Bowdish told Ricker the fence was on the property line and it did completely block the asphalt driveway approaching Lot 12 from the east. Bowdish built the fence for two reasons. First, he wanted to block Lot 12 from being able to use the access easement which runs

6

from Lot 5 to Lot 12 as shown on the Plat and Replat. Second, he wanted to mark what he thought was the boundary line.

7. From 2003 until 2007, Ricker did some landscaping including putting a one-brick level string of bricks along the north edge of his gravel driveway which was later raised at Bowdish's request to accommodate a shared flower bed. Bowdish never claimed or used any property west of the fence he had built; only Ricker used the area.

8. In 2007, Ricker tore down the mobile home on Lot 12 and started building his new home. If Ricker had had access to Lot 12 at the northeast corner of the lot, he would have built the house further south on Lot 12 and would have put his garage up on the northern part of Lot 12 and used the access there into Lot 12.

9. In addition to building his home, Ricker also constructed a manor stone patio at the northeast corner which came within inches of the wood fence Bowdish had constructed.

10. Ricker continued to use the gravel driveway across a portion of Lot 11 to access his property.

11. In 2014, Bowdish hired Daniel Holman to conduct a survey of Lot 11. The survey showed that the fence Bowdish had erected was approximately two feet east of the property line. Holman conducted a second survey in 2015 which showed that some portion of Ricker's manor stone patio encroached on Lot 11. Shortly thereafter, Bowdish removed the wood fence, pulled up the flower beds and rockeries he had put in, and piled up rocks to continue to block the access from the easement way to Lot 12.

12. After the second survey, Bowdish, or his children under his direction, went onto Ricker's property and moved or removed manor stones, spray painted with white paint Ricker's patio, fence, flower beds, and manor stone walls; killed ground cover vegetation; damaged the split rail fence; and deliberately damaged Ricker's street number address sign.

. . . .

14. While excavating Lot 11 in preparation for building his home, Ricker inadvertently or carelessly covered up a survey marker along the boundary of Lots 11 and 12.

Clerk's Papers (CP) at 146-48.

The trial court entered the following conclusions of law:

1. [The Rickers] have established and acquired title to the property west of the four-panel fence built by [Bowdish] by estoppel in pais and by adverse possession. The boundary line starts from the iron pipe near the northernmost fence post of the Bowdish fence and runs southerly in a straight line to the #4 rebar identified at 0.25 South, 0.14 East as depicted on the detail of the 2014 Holman survey admitted into evidence as Exhibit 3.

2. [The Rickers] have established an easement from the gravel driveway on their Lot 12 over a portion of [the Bowdishes'] Lot 11 to connect to Cirque Drive on several bases. First, there is an access easement over Lot 11 in accordance with the Plat and Replat. Second, [the Rickers] have established a prescriptive easement having used the easement openly and notoriously for the required 10-year period. Third, [the Rickers] have established an implied easement over the gravel driveway on Lot 11 having shown the following elements: (1) unity of title and a subsequent separation; (2) an apparent and continuous quasi easement existing for the benefit of one part of the estate to the detriment of the other during the unity of title; and (3) a certain degree of necessity that the quasi easement exist after severance.

3. [The Bowdishes are] liable to [the Rickers] for attorney's fees and costs under RCW 4.24.630 for trespassing and causing damage to [the Rickers'] property by going onto [the Rickers'] property and moving or removing manor stones, spraying white paint on [the Rickers'] patio, fence, flower beds and manor stone walls, killing ground cover vegetation, damaging the split rail fence, and deliberately damaging [the Rickers'] street number sign. These acts were clearly "wrongful" as contemplated by the statute.

4. [The Rickers have] an access easement from Lot 5 to their Lot 12 over and across [the Bowdishes'] Lots 9, 10[,] and 11 as shown on the Seamount Estates Plat and Replat and referenced in [the Bowdishes'] Deed.

. . . .

6. [The Rickers] are liable to [the Bowdishes] for damages in the amount of $750 for obliterating a survey stake. However, [the Rickers'] acts were not "wrongful" as that term is defined in RCW 4.24.630 and [Bowdish] is not entitled to treble damages or an award of attorney's fees.

7. [Bowdish] does not have a ten-foot wide utility easement, 5 feet on either side of the common boundary between Lots 11 and 12. The utility easement is reserved to the developer and subsequently to the homeowners' association. [The Bowdishes'] request to quiet title to this easement is therefore denied.

CP at 148-50.

### III. ATTORNEY FEES

Based on its finding that Mr. Bowdish had trespassed on the Rickers' property and caused damage, the trial court awarded the Rickers reasonable attorney fees pursuant to RCW 4.24.630(1). The Rickers' attorney submitted a declaration regarding legal fees which stated that the Rickers expended $18,969.67 defending the claims asserted by the Bowdishes and pursuing the counterclaims against Bowdish. The trial court determined that only three of the seven issues litigated at trial involved trespass onto the Rickers' property and awarded the Rickers 3/7ths of the total amount of legal fees expended, or $8,100. Judgment was entered against the Bowdishes for that amount, less the $750 the Bowdishes were awarded for damage to their survey marker, for a total of $7,350 awarded to the Rickers.

The Bowdishes appeal.

### ANALYSIS

### I. LEGAL PRINCIPLES

We review a trial court's decision following a bench trial to determine whether the findings are supported by substantial evidence and whether those findings support the conclusions of law. *Herring v. Pelayo*, 198 Wn. App. 828, 832, 397 P.3d 125 (2017). Unchallenged findings of fact are verities on appeal.[4] *Herring*, 198 Wn. App. at 833. We review conclusions of law de novo to determine if the findings of fact support the conclusions of law. *Scott's Excavating Vancouver,*

---

[4] The Bowdishes do not assign error to any of the trial court's findings of fact, and thus, they are verities on appeal. *Herring*, 198 Wn. App. at 833.

*LLC v. Winlock Prop., LLC*, 176 Wn. App. 335, 342, 308 P.3d 791 (2013). We defer to the trial court on issues of conflicting evidence, witness credibility, and persuasiveness of the evidence. *Scott's Excavating*, 176 Wn. App. at 342.

## II. TITLE TO PROPERTY WEST OF THE BOWDISHES' FENCE

The Bowdishes argue that the trial court erred by concluding that the Rickers had acquired title to the strip of property along the property line on the west side of the Bowdishes' property between lots 11 and 12 by equitable estoppel. We disagree and hold that the trial court did not err when it determined that the Rickers acquired title to the strip of property along the property line on the west side of lot 11 by equitable estoppel.[5]

Here, the trial court entered the following findings:

6. Bowdish subsequently erected a fence where the stake was that Bowdish had pointed out to Ricker. The fence blocked the paved apron which ran up to Lot 12. Bowdish told Ricker there was no easement over that area. Bowdish told Ricker the fence was on the property line and it did completely block the asphalt driveway approaching Lot 12 from the east. Bowdish built the fence for two reasons. First, he wanted to block Lot 12 from being able to use the access easement which runs from Lot 5 to Lot 12 as shown on the Plat and Replat. Second, he wanted to mark what he thought was the boundary line.

7. From 2003 until 2007, Ricker did some landscaping including putting a one-brick level string of bricks along the north edge of his gravel driveway which was later raised at Bowdish's request to accommodate a shared flower bed. Bowdish never claimed or used any property west of the fence he had built; only Ricker used the area.

8. In 2007, Ricker tore down the mobile home on Lot 12 and started building his new home. If Ricker had had access to Lot 12 at the northeast corner of the lot, he would have built the house further south on Lot 12 and would have put his garage up on the northern part of Lot 12 and used the access there into Lot 12.

---

[5] The trial court also concluded that the Rickers acquired this property by adverse possession. Because we affirm based on equitable estoppel, we need not address adverse possession.

9. In addition to building his home, Ricker also constructed a manor stone patio at the northeast corner which came within inches of the wood fence Bowdish had constructed.

. . . .

11. In 2014, Bowdish hired Daniel Holman to conduct a survey of Lot 11. The survey showed that the fence Bowdish had erected was approximately two feet east of the property line. Holman conducted a second survey in 2015 which showed that some portion of Ricker's manor stone patio encroached on Lot 11. . . .

CP at 147-48. Because the Bowdishes did not assign error to these findings, they are verities. *Herring*, 198 Wn. App. at 833.

The doctrine of equitable estoppel rests on the principle that a person "shall not be permitted to deny what he has once solemnly acknowledged." *Arnold v. Melani*, 75 Wn.2d 143, 147, 449 P.2d 800 (1968). Equitable estoppel requires that the party asserting it prove the following three elements:

(1) an admission, statement, or act inconsistent with the claim afterwards asserted;

(2) action by the other party on the faith of such admission, statement or act; and

(3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

*Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 54, 271 P.3d 973 (2012) (quoting *Thomas v. Harlan*, 27 Wn.2d 512, 518, 178 P.2d 965 (1947)).

Here, as to the first element, it is undisputed that Mr. Bowdish made a statement inconsistent with the claim afterwards asserted because he told the Rickers that the fence Mr. Bowdish built on lot 11 was on the boundary line between lots 11 and 12. As to the second element, the Rickers relied on Mr. Bowdish's statement about the boundary line because (1) they located their new house on lot 12 based on Bowdish's statement, (2) they installed a row of patio bricks against the fence, and (3) they built out a patio from the row of bricks against the fence to

the house. As to the third element, the Rickers were injured because the Rickers located their house in a spot that they would not have otherwise chosen if they had not relied on Mr. Bowdish's statements regarding the property line and lot access. Because their patio was placed on the disputed property, the Rickers would have had to tear out the patio if the Bowdishes were allowed to repudiate their position.

Accordingly, the trial court's findings of fact support its conclusion of law that (1) the Rickers have established and acquired title to the property west of the four-panel fence built by the Bowdishes by equitable estoppel and (2) the "boundary line starts from the iron pipe near the northernmost fence post of the Bowdish fence and runs southerly in a straight line to the #4 rebar identified at 0.25 South, 0.14 East as depicted on the detail of the 2014 Holman survey admitted into evidence as Exhibit 3." CP at 148-49. We hold that the trial court did not err by making this conclusion of law.

## III. EASEMENTS

There are three easements at issue: (1) whether the Rickers have an implied easement over lot 11 that provides access from lot 12 to Cirque Drive; (2) whether an easement for access exists over and across lots 5, 6, 7, 8, 9, 10, and 11 and terminates in lot 12; and (3) whether the Bowdishes have a ten-foot utilities easement, five feet on either side of the common boundary line, between lots 11 and 12.

### A. IMPLIED EASEMENT FROM LOT 12 TO CIRQUE DRIVE

The Bowdishes argue that the trial court erred when it concluded that the Rickers had established an implied easement over the Bowdishes' property, lot 11, to Cirque Drive for the Rickers to access their property, lot 12, via a gravel driveway. We disagree and hold that the trial

court did not err when it concluded that the Rickers established an implied easement over lot 11

from lot 12 to Cirque Drive.[6]

Here, the trial court entered the following relevant findings:

4. Pettit continued to own Lot 12 after selling Lot 11 to Bowdish. Pettit had a mobile home on Lot 12 and just south of the mobile home he had a gravel driveway on his property which ran southeasterly over a portion of Lot 11 and connected with Cirque Drive. Pettit had used the driveway when he owned both Lot 11 and Lot 12 and continued to use the driveway after he sold Lot 11 to Bowdish. . . .

. . . .

8. In 2007, Ricker tore down the mobile home on Lot 12 and started building his new home. If Ricker had had access to Lot 12 at the northeast corner of the lot, he would have built the house further south on Lot 12 and would have put his garage up on the northern part of Lot 12 and used the access there into Lot 12.

9. In addition to building his home, Ricker also constructed a manor stone patio at the northeast comer which came within inches of the wood fence Bowdish had constructed.

10. Ricker continued to use the gravel driveway across a portion of Lot 11 to access his property.

CP at 147-48. Because the Bowdishes did not assign error to these findings, we treat them as

verities. *Herring*, 198 Wn. App. at 833.

Implied easements arise from the intent of the parties, which we find from the facts and

circumstances surrounding the conveyance of land. *Roberts v. Smith,* 41 Wn. App. 861, 864, 707

P.2d 143 (1985). We look to three factors when considering whether an implied easement exists:

(1) former unity of title and subsequent separation, (2) prior apparent and continuous use of a

---

[6] The trial court also found that an easement existed based on the access easement on the plat and replat and based on prescriptive easement theory. Because we affirm based on an implied easement, we need not address the prescriptive easement.

quasi-easement benefiting one part of the estate to the detriment of another, and (3) some degree of necessity that the easement exist. *McPhaden v. Scott,* 95 Wn. App. 431, 437, 975 P.2d 1033 (1999). The first factor—former unity of title and subsequent separation—is an absolute requirement for an implied easement. *Hellberg v. Coffin Sheep Co.,* 66 Wn.2d 664, 667-68, 404 P.2d 770 (1965); *Roberts,* 41 Wn. App. at 865. But the presence or the absence of the second and third factors is not conclusive. *Hellberg,* 66 Wn.2d at 668; *Roberts,* 41 Wn. App. at 865. Instead, those factors help the court to determine the parties' intent by demonstrating the nature of the property, the extent and character of the use of the property, and how the parts of the property relate to each other. *McPhaden,* 95 Wn. App. at 437.

Absolute necessity is not required to establish an implied easement. *Evich v. Kovacevich,* 33 Wn.2d 151, 157, 204 P.2d 839 (1949). "The test of necessity is whether the party claiming the right can, at reasonable cost, on his own estate, and without trespassing on his neighbors, create a substitute." *Bays v. Haven,* 55 Wn. App. 324, 329, 777 P.2d 562 (1989). "Although prior use is a circumstance contributing to the implication of an easement, if the land cannot be used without the easement without disproportionate expense, an easement may be implied on the basis of necessity alone." *Fossum Orchards v. Pugsley,* 77 Wn. App. 447, 451, 892 P.2d 1095 (1995) (citing *Adams v. Cullen,* 44 Wn.2d 502, 268 P.2d 451 (1954)).

Here, as to the first factor, there was former unity of title and subsequent separation because the trial court found that Pettit once owned both lot 11 and 12 and used the driveway that traverses lot 11 to access lot 12 before he sold lot 11 to the Bowdishes. As to the second factor, there was prior apparent and continuous use of a quasi-easement because Pettit continued to use the driveway that traverses lot 11 to access lot 12 after he sold lot 11 to the Bowdishes.

14

As to the third factor, the trial court found that there is some degree of necessity that the easement exists because there is no other access point for lot 12. There is no other access point because Mr. Bowdish blocked the entrance at the northeast corner of lot 12 in 2001.

Accordingly, the trial court's findings of fact support its conclusion of law that the Rickers established an implied easement over lot 11 from lot 12 to Cirque Drive. We hold that the trial court did not err by making this conclusion of law.

B. ACCESS EASEMENT

The Bowdishes argue that the trial court erred when it concluded that there is an access easement granted in the plat and replat of Seamount Estates over and across lot 11, the Bowdishes' property, and terminates at lot 12, the Ricker's property. We disagree and hold that the trial court did not err when it determined that an access easement exists across lot 11, the Bowdishes' property, and terminates at lot 12, the Rickers' property, in accordance with the plat and replat of Seamount Estates.

Here, the trial court found that the plat and replat of Seamount Estates both depict an easement for access over and across lots 5, 6, 7, 8, 9, 10, and 11, and terminates in lot 12 to provide access for those lots. Because the Bowdishes did not assign error to this finding, it is treated by this court as a verity. *Herring*, 198 Wn. App. at 833. The trial court's finding is sufficient to support its conclusion that an access easement exists over lot 11 and terminates in lot 12 in accordance with the language in the plat and replat.

C. UTILITIES EASEMENT

The Bowdishes argue that the trial court erred by concluding that they did not have a ten-foot wide utilities easement, which includes five feet on either side of the common boundary line,

between lot 11 and lot 12. We disagree and hold that the trial court did not err when it concluded that the Bowdishes do not have a ten-foot wide utilities easement, five feet on either side of the common boundary line, between lots 11 and 12.

The trial court found that a ten-foot utilities easement, five feet on either side of the common boundary line of each lot in Seamount Estates, was first referenced in the Protective Covenants, dated January 20, 1977, and initially recorded on September 6, 1977. The court also found that a Quit Claim Deed from the developers to Seamount Estates Community Club was dated April 8, 1977, and recorded on May 24, 1977. The court further found that Protective Covenants were subsequently re-recorded by Seamount Estates on March 18, 1994. Because the Bowdishes did not assign error to these findings, they are verities. *Herring*, 198 Wn. App. at 833.

Both of the recorded Protective Covenants state that the utilities easement is "reserved," rather than "granted." Exs. 7, 24. Based on the trial court's findings, the language in the recorded Protective Covenants "reserved" the utilities easement. Thus, we hold that the trial court did not err when it concluded that the Bowdishes do not have a utilities easement over the Rickers' property.

## IV. ATTORNEY FEES

### A. TRIAL COURT'S AWARD OF ATTORNEY FEES AND COSTS

The Bowdishes argue that the trial court erred by awarding the Rickers attorney fees under RCW 4.24.630(1), awarding the Rickers 3/7ths of the fees incurred, and failing to award treble damages and attorney fees to the Bowdishes under RCW 4.24.630(1). We disagree.

"An appellate court will uphold an attorney fee award unless it finds the trial court manifestly abused its discretion." *Berryman v. Metcalf*, 177 Wn. App. 644, 656-57, 312 P.3d 745

(2013). "Discretion is abused when the trial court exercises it on untenable grounds or for untenable reasons." *Berryman*, 177 Wn. App. at 657. "Courts must take an *active* role in assessing the reasonableness of fee awards, rather than treating costs as a litigation afterthought." *Mahler v. Szucs*, 135 Wn.2d 398, 434, 957 P.2d 632 (1998). "[The trial court] must supply findings of fact and conclusions of law sufficient to permit a reviewing court to determine why the trial court awarded the amount in question." *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 144, 331 P.3d 40 (2014).

RCW 4.24.630(1) authorizes an award of treble damages, plus reasonable attorney fees and costs, payable by any "person who goes onto the land of another and . . . wrongfully injures personal property or improvements to real estate on the land." *Clipse v. Michels Pipeline Constr., Inc.*, 154 Wn. App. 573, 576-77, 225 P.3d 492 (2010) (emphasis omitted). RCW 4.24.630(1) further states that "a person acts 'wrongfully' if the person intentionally and unreasonably commits the act or acts while knowing, or having reason to know, that he or she lacks authorization to so act." *Clipse*, 154 Wn. App. at 577, 580 (emphasis omitted) (a "wrongful" act must have been intentional).

Because Mr. Bowdish intentionally moved or removed manor stones; spray painted with white paint the Rickers' patio, fence, flower beds, and manor stone walls; killed ground cover vegetation; damaged the split rail fence; and deliberately damaged the Rickers' street number address sign, Mr. Bowdish did *wrongfully* injure the Rickers' property. Therefore RCW 4.24.630(1) supports the trial court's award of attorney fees and costs to the Rickers.

The trial court awarded the Rickers 3/7ths of their requested attorney fees because they prevailed on three of the seven issues they raised. The three issues the trial court awarded fees on

were (1) the title to the property west of the fence, (2) the Rickers' driveway easement, and (3) the Bowdishes' trespass and damage to the Rickers' property. The Bowdishes argue that the trial court erred in awarding 3/7ths of the fees incurred rather than some lesser amount. We conclude that the trial court did not abuse its discretion in segregating attorney fees.

Regarding the Bowdishes' RCW 4.24.630(1) claim, Mr. Ricker did not cover the survey marker along the boundary of lots 11 and 12 intentionally. Therefore, Mr. Ricker did not *wrongfully* injure the Bowdishes' property and RCW 4.24.630(1) cannot support an award of attorney fees or treble damages to the Bowdishes.

Accordingly, we affirm the trial court's award of reasonable attorney fees to the Rickers and the trial court's denial of treble damages and attorney fees to the Bowdishes.

B. APPELLATE ATTORNEY FEES

Citing RCW 4.24.630(1), the Bowdishes request an award of reasonable attorney fees and costs on appeal. Under RAP 18.1, the prevailing party is entitled to attorney fees and costs on appeal when applicable law authorizes the award. *McGuire v. Bates*, 169 Wn.2d 185, 191, 234 P.3d 205 (2010). We deny this request because the Bowdishes are not the prevailing party, and thus, they are not entitled to appellate attorney fees and costs.

Citing RCW 4.24.630(1), the Rickers also request an award of reasonable attorney fees and costs on appeal. We grant this request because the Rickers are the prevailing party. However, the Rickers can recover only those reasonable attorney fees relating to their RCW 4.24.630(1) claim.

CONCLUSION

We affirm the trial court's conclusions of law related to the judgment quieting title, the three easements at issue, the attorney fee award to the Rickers, and the denial of treble damages and attorney fees to the Bowdishes. We also grant the Rickers an award of reasonable attorney fees on appeal relating to their RCW 4.24.630(1) claim.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, C.J.

LEE, J.